WO                                                                                                    JL

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Derek Krause,<br><br>                    Plaintiff,<br><br>v.<br><br>Yavapai County, et al.,<br><br>                    Defendants. | No.  CV 19-08054-PCT-MTL (ESW)<br><br><br>**ORDER** |

Plaintiff Jason Derek Krause, through counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983.  Defendants Belmore,[1] Mike Dannison, Gordon Diffendaffer, Scott Mascher, Gene McFarland, Dennis Price, Roger Williamson, and Yavapai County (the "County Defendants") filed a Motion for Judgment on the Pleadings.[2] (Doc. 114.)  Defendants Dick Erfert, Edward Hueske, and Terry Weaver (the "State Defendants") filed a Joinder in the Motion for Judgment on the Pleadings (Doc. 117.) Plaintiff opposes the Motion.  (Doc. 122.)

---

[1] Defendant Belmore was named as "Bellmore" in the First Amended Complaint. The Court will adopt the spelling indicated in Defendants' briefing.

[2] In the First Amended Complaint, Plaintiff named as Defendants Mike Winney, Philip Keen, Ernest Peele, and Dan Martin.  On October 5, 2019, Defendants filed a Suggestion of Death as to Winney.  (Doc. 72.)  On June 19, 2020, the Court dismissed Defendant Winney.  (Doc. 99.)

On February 4, 2020, the parties filed a Stipulation of Dismissal without Prejudice of Defendant Keene.  (Doc. 73.)  On April 3, 2020, the Court granted Defendant Peele's Motion to Dismiss him as a Defendant.  (Doc. 83.)  On May 12, 2020, Plaintiff filed a Notice of Party Dismissal as to Defendant Martin.  (Doc. 89.)

The Court will grant the Motion for Judgment on the Pleadings and dismiss the Amended Complaint without prejudice and with leave to amend.

## I.  Federal Rule of Civil Procedure 12(c)

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed but early enough not to delay trial."  The purpose of a Rule 12(c) motion is "to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts."  *Herbert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam).

In deciding a motion for judgment on the pleadings under Rule 12(c), the Court must inquire whether the complaint contains "sufficient factual matter, accepted as true, to state a claim of relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (finding that *Iqbal* applies to Rule 12(c) motions because Rule 12(b)(6) and Rule 12(c) motions are functionally equivalent).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  However, the Court is not required "to accept as true a legal conclusion couched as a factual allegation."  *Id.*

Under both Rule 12(c) and Rule 12(b)(6), dismissal of a complaint, or any claim within it, for failure to state a claim may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

## II.  Amended Complaint

After a jury trial, Plaintiff was found guilty of manslaughter in connection with the

shooting death of Charles Thurman.  (Doc. 56 at 30 ¶ 171.)[3]  Plaintiff served 10.5 years in prison.  (*Id.* ¶ 172.)

On November 19, 2015, the Arizona Court of Appeals overturned Plaintiff's conviction, finding that newly discovered evidence regarding comparison of the lead content of bullets, as performed by Special Agent Peele, probably would have changed the verdict.  *State v. Krause*, 2015 WL 7301820 (Ariz. Ct. App. Nov. 19, 2015).  On March 1, 2017, the Yavapai County Clerk entered the Superior Court's Order of Dismissal, dismissing the charges against Plaintiff, releasing him from all punishment and disabilities resulting from the conviction, and restoring his civil rights *nunc pro tunc*.  (*Id.* at 31 ¶ 180.)

In his Amended Complaint, Plaintiff relevantly alleges the following:

Defendant Yavapai County, through the individual Defendants and through the Yavapai County Sheriff's Office (YCSO) generally, failed to conduct an adequate investigation into the shooting of Charles Thurman.  (*Id.* at 9 ¶ 40.)  Instead, Defendants "fabricate[d]" evidence to "frame" Plaintiff, and he was convicted as a result.  (*Id.* ¶ 41.)

**A.      Death of Charles Thurman**

In June 1994, Plaintiff owned and operated his own auto mechanic shop and lived with his wife and young son.  (*Id.* at 8 ¶ 26.)  On the evening of June 24, 1994, Plaintiff was standing in his front yard with his .22 rifle, looking for skunks that had been getting into his family's chicken coop, when he heard gunfire and a loud vehicle coming down the road toward him and his home.  (*Id.* ¶ 27.)  As Plaintiff's neighbors told police, they saw a vehicle, an open-top Jeep, speeding down the road toward Plaintiff's home, and they heard gunfire and saw muzzle fire from the Jeep as it passed their homes.  (*Id.* ¶ 28.)  As Plaintiff told police, and later testified at his criminal trial, as the Jeep approached his property and the gunfire from it continued, he fell to the ground and tried to cover his head.  (*Id.* ¶ 29.)

When Plaintiff fell to the ground, his .22 rifle accidentally discharged once.  (*Id.* ¶ 30.)  The open-top Jeep was carrying four teenagers.  (*Id.* ¶ 31.)  As the Jeep approached

---

[3] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

Plaintiff's house, it veered off the road and came to rest after colliding with Plaintiff's truck. (*Id.* ¶ 32.) Charles Thurman, the Jeep's driver, was slumped over the steering wheel. (*Id.* ¶ 33.) He had been shot in the head. (*Id.*) The bullet entered from behind and above Thurman's left ear and exited above his left eye, in a slight downward trajectory. (*Id.* ¶ 34.) There were also apparent bullet impacts to the Jeep's rocker panel and left-rear tire. (*Id.* ¶ 35.) After the Jeep crashed, and before he was aware that anyone was hurt, Plaintiff asked a girl from the Jeep who approached him why they were "doing a drive by" on his house. (*Id.* ¶ 36.)

After hearing that Charles Thurman was shot, Plaintiff immediately went inside to dial 9-1-1, and alerted his wife, a paramedic, to check on the teenager's condition. (*Id.* at 9 ¶ 37.) When questioned by police on June 24, 1994, Plaintiff admitted that his rifle discharged, explaining that it was accidental, and occurred as he fell to the ground and tried to cover his head as the gunfire-emitting Jeep approached him. (*Id.* ¶ 38.) Plaintiff consented to the police search of his property and cooperated with their investigation. (*Id.* ¶ 39.)

**B.    Investigation**

Defendants' theory at trial was that Plaintiff intentionally fired multiple rounds into and at the Jeep. (*Id.* at 10 ¶ 45.) The only testing conducted by the State was a ballistics evaluation,[4] a drag sled test to estimate the Jeep's speed, and a "string" trajectory test relating to the angle of the bullet hole in the Jeep's rocker panel. (*Id.* ¶ 51.)

**1.    String Trajectory Test**

Defendant Scott Mascher, who was then a YCSO Lieutenant, conducted the "string" trajectory test on Monday, June 27, 1994, in an attempt to analyze the trajectory of the bullet that hit the left, rear rocker panel of the Jeep. (*Id.* ¶ 52.) Defendant Mascher conducted the "string" test with the assistance of Defendants Deputy Belmore, Sergeant Dennis Price, and Yavapai County Attorney's Office Investigator Roger Williamson. (*Id.*

---

[4] The ballistics evaluation was conducted by Special Agent Peele using CBLA. As noted above, Special Agent Peele is no longer a Defendant in this case, and the allegations concerning his use of CBLA and his conclusions are irrelevant.

at 11 ¶ 53.)  After conducting the "string" test, Defendant Mascher concluded the bullet that hit the Jeep rocker panel was shot from a standing position.  (*Id.* ¶ 54.)

Arizona Department of Public Safety (DPS) Crime Lab expert Defendant Edward Hueske conducted a laser analysis after the indictment, which led Defendant Mascher to admit that the string test's flaws led to the faulty conclusion that Plaintiff had been standing.  (*Id.* ¶ 56.)  Specifically, because of the distance between the shooting position and the Jeep (approximately 140 feet), the string was an inaccurate device because it naturally bowed and flexed.  (*Id.* ¶ 57.)  Defendant Mascher admitted that the string test was inaccurate in this case because it was done outdoors.  (*Id.* ¶ 58.)

### 2.     Laser Trajectory Test

Defendants Hueske, Criminalist Terry Weaver, and Latent Print Examiner Dick Erfert, of the DPS Crime Lab, conducted a laser test to determine an accurate trajectory of the bullet that hit the rocker panel.  (*Id.* ¶ 59.)  In analyzing bullet trajectory, Defendant Hueske relied on photos of the vehicle and the undisputed position of Plaintiff in his yard.  (*Id.*)  Hueske then calculated "both vertical and horizontal angles and determined the angle of the bullet in the rocker panel to be 55-degree horizontal, coming from the rear."  (*Id.* ¶ 60.)  Defendant Hueske then applied a laser test to get an accurate bullet trajectory.  (*Id.* ¶ 61.)  Based on that laser test, as Defendant Hueske testified at Plaintiff's trial, Defendants Hueske, Weaver, and Erfert concluded that "the shooter was eye level with the rocker panel and that the barrel and Jeep were perpendicular to one another."  (*Id.* at 12 ¶ 62.)  Defendants Hueske, Weaver, and Erfert never conducted a similar laser test to determine the trajectory of the bullet that entered Charles Thurman's head.  (*Id.* ¶ 63.)  Following Defendant Hueske's testimony, Defendant Mascher changed his original assumption that Plaintiff had been standing and conceded that the shot came from the ground level.  (*Id.* ¶ 64.)

Defendants Hueske, Weaver, and Erfert did not conduct the same type of analysis to determine the trajectory of the bullet to Charles Thurman's head.  (*Id.* ¶ 65.)  No one conducted or attempted to obtain any form of test to determine the trajectory of the bullet

that entered Charles Thurman's head.  Defendants Hueske, Weaver, and Erfert did not check the angles necessary to inflict the fatal gunshot wound.  (*Id.*)

Defendants Hueske, Weaver, and Erfert also conducted a firearms analysis of Plaintiff's semiautomatic rifle that YCSO officers collected from Plaintiff's property.  (*Id.* at 13 ¶ 68.)  Defendant Hueske analyzed the speed at which consecutive shots could be fired from Plaintiff's rifle and the velocity of bullets emitted from the rifle.  (*Id.* ¶ 69.)  Defendant Hueske also conducted and testified to an accident reconstruction that analyzed how the three presumed bullets – the one that hit Charles Thurman, the one that presumably hit the Jeep's rocker panel, and the one that presumably hit the Jeep's rear-left tire – could have been shot by a single shooter.  (*Id.* ¶ 70.)  To conduct this accident reconstruction, Defendant Hueske received an inaccurate estimation that the Jeep was traveling at a low speed at the time it was passing Plaintiff's house.  (*Id.* ¶ 71.)  This was based on the "speed" test conducted by Defendant Dennis Price, a YCSO Training Coordinator and Sergeant.  (*Id.*)  Using that speed estimation in connection with the rate at which Plaintiff's rifle could fire consecutive shots and the velocity at which the bullets traveled, Defendant Hueske concluded that all three bullets could have been shot from one shooter.  (*Id.* at 13-14 ¶ 72.)

Defendant Hueske concluded and testified at trial that the presumed bullet holes in the rocker panel and the tire well could have been shot by the same gun held in the same position.  (*Id.* at 14 ¶ 73.)  Defendant Hueske concluded and testified at trial that the bullet that hit Charles Thurman could also have been shot by the same gun, but the gun would have had to have been repositioned due to the difference in height and its position directly above the rocker panel.  (*Id.* ¶ 74.)  Defendant Hueske concluded and testified at trial that the shooter could have been "tracking" Charles Thurman, which Hueske defined as "following the target with the sights of the weapon."  (*Id.* ¶ 75.)  Defendant Hueske concluded and testified at trial that the shooter would have had to have been positioned lying on the ground.  (*Id.* ¶ 76.)  At Plaintiff's trial, Defendant Hueske testified that he did not test whether the rifle would fire a shot when hit against the ground because he "wasn't asked" to do so and because he "saw no reason to do it as well, given the information that

1     [he] was supplied." (*Id.* ¶ 77.)

2          **3.**      **Drag Sled Test**

3          The Jeep's speed was estimated through the use of a drag sled by Defendant Price.

4 (*Id.* at 14-15 ¶ 78.) Defendant Price estimated the Jeep's speed using only partial

5 information. (*Id.* at 15 ¶ 79.) Defendant Price's speed conclusions slowed down the Jeep

6 the victim was driving so that Plaintiff could have fired off three rounds in the time the

7 Jeep passed Plaintiff's house, when the facts subsequent to trial showed the Jeep was

8 traveling at a rate of speed at which it would have been impossible for Plaintiff to fire off

9 three rounds, and he therefore could not have been the shooter. (*Id.*) If Plaintiff had not

10 fired off the three rounds, he could not have been the shooter, or have killed Charles

11 Thurman. (*Id.*) Defendant Price failed to consider the loss of speed during the Jeep's

12 impact with Plaintiff's truck when making his determination of the Jeep's speed, the

13 relative weight of the Jeep and the truck when making his determination of the Jeep's

14 speed, and the fact that Plaintiff's truck was locked in gear. (*Id.* ¶¶ 80-82.)

15          **4.**      **Investigation of Crime Scene**

16          Non-party Forest Service Officer John Shumate reported finding fresh beer cans

17 alongside the creek that matched the brand of beer cans he also saw inside the Jeep. (*Id.* at

18 18 ¶ 98.) Defendant YCSO Deputy Gene McFarland testified at Plaintiff's trial that he

19 noticed beer cans by the creek, but he did not collect the beer cans for evidence. (*Id.* ¶¶

20 99-100.) Defendant McFarland did not search for a discarded gun or guns by the creek.

21 (*Id.* ¶ 101.)

22          Defendant Williamson testified at trial that shortly after the incident, he observed

23 several .22 caliber casings and at least one unspent .22 bullet in the rear seat area of the

24 Jeep. (*Id.* ¶ 103.) Defendants never photographed or inventoried the Jeep's contents,

25 contrary to procedure. (*Id.* ¶ 104.) Defendants did not book the bullet and casings into

26 evidence, contrary to standard police procedure. (*Id.*) Defendant Williamson admitted the

27 Jeep's contents should have been photographed in the routine course of such an

28 investigation. (*Id.* ¶ 105.) This failure to preserve evidence further contributed to

Plaintiff's conviction, as he was unable to use the casings and bullet(s) in the backseat area to show that the teenagers behind Charles Thurman's left ear (*i.e.*, where the bullet entered) were shooting off one or more .22 caliber weapons, and possibly discharged the shot that killed Mr. Thurman. (*Id.* at 19 ¶ 106.) One month after being sent to the impound lot, the Jeep was burglarized, and the .22 casings and rounds were stolen, along with the Jeep's stereo and speakers. (*Id.* ¶ 108.) No one from YCSO accounted for these casings and/or bullets. (*Id.* ¶ 109.)

### 5. Witness Statements and Evidence of Third-Party Culpability

Other than talking to the three passengers who were in the Jeep with Charles Thurman, investigating law enforcement representatives did nothing to investigate the possibility that an occupant of the Jeep fired the bullet that killed Charles Thurman. (*Id.* at 17 ¶ 92.) The Jeep passengers made statements that they all had been drinking, including Charles Thurman, on the night of June 24, 1994. (*Id.* ¶ 93.) One of the passengers, Stacy Clark, testified at Plaintiff's trial that after the Jeep crashed into Plaintiff's truck, the passengers threw beer cans into the creek. (*Id.* ¶ 94.) One of the passengers, Terry Eckerman, admitted that after the Jeep crashed into Plaintiff's truck, he buried beer cans in the creek. (*Id.* ¶ 95.) Defendants knew witnesses reported hearing gunshots and seeing muzzle fire coming from the Jeep on the night in question, but they failed to investigate whether one of the teenagers in the Jeep, or another person in a car following the Jeep, could have been the responsible party. (*Id.* ¶ 96.) They failed to preserve or locate the evidence of drinking and the bullet and casings found in the Jeep. (*Id.*) Investigating law enforcement did not investigate whether the occupants of the Jeep may have had firearms and whether they may have hidden those firearms when they hid their beer down by the creek. (*Id.* ¶ 97.) The officers never searched for gun(s) that the passengers might have discarded with the beer cans. (*Id.*)

Defendant Mascher, in charge of the investigation, as well as the investigating detectives and officers, failed to thoroughly investigate whether a third party was responsible for the killing of Charles Thurman. (*Id.*) Substantial evidence existed that

someone other than Plaintiff shot Charles Thurman. (*Id.* at 23 ¶ 136.) Defendant Mascher admitted that he had considered the possibility that someone in the Jeep could have accidently discharged the weapon that shot Charles Thurman. (*Id.* at 20 ¶ 114.) Specifically, Defendant Mascher admitted that he suspected that passenger Terry Eckerman could be responsible. (*Id.* ¶ 115.) Defendant Mascher also believed that passenger Stacy Clark could have been involved. (*Id.* ¶ 116.)

A neighbor told Defendant Diffendaffer that just after he went to bed, but before he fell asleep, he heard a vehicle traveling North down the canyon. (*Id.* at 26.) The neighbor also heard what he believed to be gunshots coming from the vehicle as it was moving. (*Id.*)

### 6. Testing of Jeep

With the assistance of Defendant Mike Dannison, a Mechanic at Yavapai County Fleet Management, Deputy Martin started the Jeep, let it warm up, and accelerated it while it was out of gear. (*Id.* at 27 ¶ 147.) While the choke was still activated, the vehicle popped through the mufflers on occasion, but it was not consistent. (*Id.*) The sound was not loud; it was more like a hiss. (*Id.*) Defendant Dannison and Deputy Martin briefly turned off the car, turned it back on while the engine was on compression, and the Jeep backfired with a loud bang that sounded like a shot and sent out a visible flame. (*Id.*) Thereafter, Defendant Dannison and Deputy Martin made the Jeep backfire multiple times, with varying sounds and successions. (*Id.* ¶ 149.) However, there was no fire after the first backfire. (*Id.*) Defendant Dannison testified at trial, in part, concerning his "efforts to make the Jeep backfire in a fashion that sounded like a gunshot." (*Id.* ¶ 152.)

### B. Plaintiff's Claims

In Count I of the First Amended Complaint, Plaintiff alleges that Defendants Mascher, Belmore, Diffendaffer, Erfert, Hueske, McFarland, Williamson, Weaver, Dannison, and Price, while acting under color of state law, caused Plaintiff to be deprived of the due process right to a fair trial secured by the Fifth and Fourteenth Amendments by, *inter alia*, fabricating evidence; failing to disclose material exculpatory evidence; destroying or failing to preserve exculpatory and potentially exculpatory evidence; and

conducting a reckless investigation into the murder of Charles Thurman.  (*Id.* at 34 ¶ 196.) Plaintiff asserts that Defendants "conspired and agreed to commit" the above-described unconstitutional deprivations of Plaintiff's rights and acted in concert to deprive Plaintiff of his rights to be free from unreasonable seizures, to due process, to a fair trial, and to be free from groundless criminal prosecutions based on false evidence."  (*Id.* ¶ 198.)

In Count II, Plaintiff claims his wrongful arrest, confinement, prosecution, trial, conviction, and incarceration were caused by the unconstitutional action and inaction of Defendant Mascher, acting in his individual capacity and under color of law as supervisor of the detectives, officers, investigators, experts, and others involved in the investigation Charles Thurman's death.  (*Id.* at 35 ¶ 203.)  Plaintiff alleges that Defendant Mascher "culpably" failed to adequately discipline, train, supervise, and/or control his subordinates, including Defendants Belmore, Diffendaffer, Erfert, Hueske, McFarland, Williamson, Weaver, Dannison, and Price, and by generally showing a reckless or callous indifference to Plaintiff's rights.  (*Id.* at 36 ¶ 207.)

In Count III, Plaintiff alleges that Defendant Yavapai County possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting the operation of the YCSO and the actions of employees of the YCSO, including customs, policies and/or practices relating to police tactics, methods, investigations, arrests, evidence, and discovery; as well as to personnel supervision, performance evaluation, internal investigations, discipline, records maintenance, and/or retention.  (*Id.* at 37 ¶ 212.) Plaintiff asserts that YCSO and Defendant Yavapai County, with deliberate indifference to and/or reckless disregard for the safety, security, and constitutional and statutory rights of Plaintiff and/or the truth, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied unconstitutional policies, practices and/or customs with respect to the investigation and prosecution of crimes.  (*Id.* ¶ 214.)  Plaintiff claims Defendant Yavapai County had knowledge, prior to and since June 24, 1994, of repeated allegations and instances of misconduct by officers, employees, and/or agents of YCSO in relation to the investigation and prosecution of criminal offenses, including fabrication of evidence,

1   suppression of exculpatory evidence, dishonesty, and abuse of authority.  (*Id.* at 38 ¶ 216.)

2   Plaintiff alleges that Defendant Yavapai County maintained and enforced YCSO customs,

3   polices and/or practices of hiring, retaining, training, assigning, supervising, and failing to

4   discipline officers, supervisors, and other employees and/or agents who have a propensity

5   for violating the due process rights of the accused, dishonesty, and abuse of authority,

6   among other failures in their duties.  (*Id.* ¶ 217.)

7   **III.   Discussion**

8       To prevail in a § 1983 claim, a plaintiff must show that (1) acts by the defendants

9   (2) under color of state law (3) deprived him of federal rights, privileges or immunities and

10  (4) caused him damage.  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir.

11  2005) (quoting *Shoshone-Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278,

12  1284 (9th Cir. 1994)).  In addition, a plaintiff must allege that he suffered a specific injury

13  as a result of the conduct of a particular defendant and he must allege an affirmative link

14  between the injury and the conduct of that defendant.  *Rizzo v. Goode*, 423 U.S. 362, 371-

15  72, 377 (1976)

16      In their Motion for Judgment on the Pleadings, the County Defendants contend the

17  individual County Defendants did not violate Plaintiff's due process rights and are entitled

18  to qualified immunity in any event.  (Doc. 114 at 7.)  The County Defendants also assert

19  that Plaintiff fails to state a claim against Defendant Yavapai County pursuant to *Monell v.*

20  *Dept's of Soc. Servs.*, 436 U.S. 658 (1978).  (*Id.*)  In their Joinder in the Motion for

21  Judgment on the Pleadings, the State Defendants join in and incorporate the factual and

22  legal arguments set forth in the County Defendants' Motion.  (Doc. 117 at 3.)

23      As an initial matter, the Court notes that the Fifth Amendment's due process clause

24  only applies to the federal government, not to state law enforcement officials.  *See, e.g.*,

25  *Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008) ("the Fifth Amendment's due

26  process clause only applies to the federal government.").  Thus, Plaintiff's due process

27  claims arise under the Fourteenth Amendment.

28  . . . .

### A.    Qualified Immunity

A defendant is entitled to qualified immunity if his or her conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show that the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation.  *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

### 1.    Defendant Belmore

Plaintiff's sole allegation against Defendant Belmore is that Defendant Mascher conducted the "string" test with the "assistance" of Defendant Belmore and others.  (Doc. 56 at 11 ¶ 53.)  The County Defendants assert that "[t]here are no fact[ual] allegations describing the precise nature of this 'assistance,'" and therefore, the allegation fails to state a plausible claim that withstands qualified immunity.  (Doc. 114 at 14.)

Plaintiff does not allege that Defendant Belmore failed to disclose material, exculpatory evidence or that Belmore, in bad faith, failed to collect or preserve potentially useful evidence.  Rather, Plaintiff's claim is based on the purported inaccuracy of the "string" test.  Plaintiff alleges that Defendant Belmore "acted with other Defendants in bad faith knowing the string test was fundamentally flawed," but Plaintiff's *factual* allegations do not support a conclusion that *Belmore* knew the string test was inaccurate; in fact, Plaintiff alleges that after conducting the "string" test, Defendant Mascher concluded the bullet that hit the Jeep rocker panel was shot from a standing position, and subsequently, Mascher admitted that the string test was inaccurate in this case because it was done outdoors.  (*Id.* ¶ 58.).  Plaintiff does not allege that Defendant Belmore reached any conclusion regarding the trajectory of the bullet that hit the Jeep rocker panel, let alone that Belmore took any action in response to the string test that affected the outcome of the investigation or the trial.  Thus, Plaintiff has not alleged facts sufficient to support a

conclusion that he suffered any specific injury because of Defendant Belmore's participation in conducting the string test.  The Court therefore finds that Plaintiff has not stated a due process claim against Defendant Belmore.

### 2.    Defendant McFarland

Plaintiff's claim against Defendant McFarland is based on McFarland's failure to photograph or collect beer cans he saw by the creek and failure to search for a discarded gun in that area.  (Doc. 56 at 18 ¶¶ 99-101.)  Plaintiff alleges that Defendant McFarland, along with the other individual Defendants, "acted with reckless indifferen[ce]" to his "constitutional rights and to the truth by failing to investigate and preserve" the beer cans. (*Id.*)

The County Defendants assert that Plaintiff has not alleged that Defendant McFarland deliberately fabricated any material facts, and McFarland testified freely at trial regarding his beer can findings.  (Doc. 114 at 14.)  The County Defendants also argue that Plaintiff makes no allegation that the jury was deprived of knowing about the beer cans, or that, if collected, the beer cans were susceptible to some kind of test that would have exonerated Plaintiff.  (*Id.*)

In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Supreme Court noted that failure to preserve even potentially exculpatory evidence does not automatically constitute a due process violation.  *Id.* at 58.  It is only when the "defendant can show bad faith on the part of the police[ ] [that] failure to preserve potentially useful evidence" amounts to the denial of due process.  *Id.*

Here, although Plaintiff characterizes his claim against Defendant McFarland as a failure to "investigate and preserve" evidence, Plaintiff actually alleges a failure to *collect* potentially useful evidence, which is "distinctly different" from "destruction of evidence that is already extant."  *United States v. Martinez-Martinez*, 369 F.3d 1076, 1087 (9th Cir. 2004).  Plaintiff has not alleged that Defendants *destroyed* the beer cans.  Rather, Plaintiff's claim "boils down to an argument that the government ought to have" collected this evidence.  *See id.*

In any event, even if Plaintiff had asserted a claim that Defendant McFarland had destroyed evidence, Plaintiff has not alleged facts sufficient to state a due process claim. To prevail on a claim that the failure to preserve evidence violates Plaintiff's due process rights, Plaintiff must allege facts to support a conclusion that the evidence was "material." Evidence is material if it "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 478, 488-89 (1984).

Here, Plaintiff does not allege facts to support that the beer cans had apparent exculpatory value. Plaintiff alleges that one of the passengers in the Jeep, Terry Eckerman, "admitted" that he had buried beer cans in the creek. Plaintiff claims Defendants collectively "failed to preserve or locate" evidence of "drinking" by the other passengers in the Jeep. However, Plaintiff does not allege that Defendant McFarland *specifically* was aware that Eckerman had admitted he had buried beer cans. Thus, if the beer cans were buried, and Defendant McFarland was not aware of Eckerman's statement, then it would not have been apparent to McFarland that he needed to look for beer cans at the scene.

Moreover, Plaintiff's allegation that the occupants of the Jeep may have had also hidden firearms when they hid the beer cans does not support a conclusion that the beer cans were "material." Plaintiff does not allege that Defendant McFarland was aware that witnesses had reported hearing gunshots and seeing muzzle fire coming from the Jeep. Thus, Plaintiff's allegations do not support a conclusion that Defendant McFarland had reason to believe there might be guns in the same area as the beer cans. In addition, Plaintiff does not allege that the existence of the beer cans was hidden from the jury.

Similarly, Plaintiff's allegation that Defendant McFarland's failure to search for guns in the area violated his due process rights asserts, at most, a claim that McFarland failed to collect potentially useful evidence. The Supreme Court has held that negligent failure to investigate other leads or suspects does not violate due process. *See Daniels v. Williams*, 474 U.S. 327, 334 (1986). However, a plaintiff may be able to state a due process

violation by alleging that a defendant recklessly investigated a crime. *Cf. County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

The general test for whether law enforcement's investigation of a crime amounts to a due process violation is whether law enforcement's actions "shock[] the conscience." *Id.* Thus, the Supreme Court has considered whether the state of mind of recklessness supports a § 1983 claim by shocking the conscience and therefore violating due process. *See id.* at 854. In *Lewis*, which involved a high speed police chase, the Supreme Court noted that "[t]o recognize a substantive due process violation in these circumstances when only midlevel fault has been shown would be to forget that liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* at 853.

Here, Plaintiff's allegations indicate, at most, "midlevel fault" on Defendant McFarland's part for failing to collect the beer cans or search for guns in the area where the beer cans had been buried. Plaintiff has not alleged any facts to support a conclusion that Defendant McFarland failed to collect the evidence with an intent to harm Plaintiff. *Cf. id.* at 854 (only an intent to harm in the context of high-speed chases rises to the level of a constitutional violation). Thus, the Court finds that Plaintiff has failed to state a due process claim against Defendant McFarland.

### 3.    Defendant Price

Plaintiff alleges that Defendant Price conducted a "speed" test by using a "drag sled" to determine the speed of the Jeep. (Doc. 56 at 15 ¶ 78.) Plaintiff asserts that Defendant Price estimated the Jeep's speed using only partial information; specifically, Plaintiff claims Defendant Price failed to consider the loss of speed during the Jeep's impact with Plaintiff's truck when making his determination of the Jeep's speed, the relative weight of the Jeep and the truck when making his determination of the Jeep's speed, and the fact that Plaintiff's truck was locked in gear. (*Id.* ¶ 79.) Plaintiff asserts that because Defendant Price relied on incomplete or inaccurate information, Price's speed conclusions slowed

down the Jeep the victim was driving so that Plaintiff could have fired off three rounds in the time the Jeep passed Plaintiff's house.  (*Id.*)

The County Defendants assert that Plaintiff does not allege that Defendant Price "arrived at a different calculation yielding a higher speed analysis, but then deliberately fabricated a lower speed finding."  (Doc. 114 at 16.)  Rather, the County Defendants contend, Plaintiff alleges only that due to Defendant Price's inexperience in 1994, Price "did not take into account facts" that were accounted for later.  (*Id.*)

Plaintiff's allegations indicate that Defendant Price made an error in conducting the speed test.  Plaintiff does not allege facts to support a conclusion that Defendant Price *intentionally* relied on partial information in determining the Jeep's speed for the purpose of harming Plaintiff.  *Cf. id.*  In addition, Plaintiff does not allege that Defendant Price drafted a report that was admitted at trial or testified at trial as to his conclusion regarding the speed of the test.  Thus, it is unclear from Plaintiff's allegations how he was harmed by Defendant Price's conclusion.  The Court finds that Plaintiff has not stated a due process claim against Defendant Price.

### 4.    Defendant Williamson

Plaintiff alleges that Defendant Williamson testified at trial that shortly after the incident, he observed several .22 caliber casings and at least one unspent .22 bullet in the rear seat area of the Jeep.  (Doc. 56 at 18 ¶ 103.)  Defendant Williamson admitted the Jeep's contents should have been photographed before it was seized in the routine course of such an investigation.  (*Id.* ¶ 105.)  Thus, as discussed above, Plaintiff's claim against Defendant Williamson is a claim for failure to *collect* evidence, not a failure to preserve evidence. Plaintiff does not allege facts to support a conclusion that Defendant Williamson acted in bad faith by failing to photograph or collect the casings and unspent bullets; although Williamson admitted the evidence should have been photographed, according to Plaintiff's allegations, Mike Winney was responsible for collecting and photographing evidence.  (*Id.* at 19-20 ¶¶ 110-13.)

Moreover, Plaintiff alleges that the casings and unspent bullet were stolen when the

Jeep was impounded, not that they were destroyed, and he alleges no facts to support a conclusion that Defendant Williamson was responsible for the evidence being stolen. *See Youngblood*, 488 U.S. at 56 n.* ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.") Plaintiff also does not allege facts to support a conclusion that he suffered any specific injury as a result of Defendant Williamson's failure to photograph or collect the evidence. Rather, the evidence was unavailable to Plaintiff because it was stolen. Thus, the Court finds that Plaintiff has not stated a due process claim against Defendant Williamson based on his failure to collect evidence.

Plaintiff also alleges that Defendant Williamson assisted Defendant Mascher with the string test. For the reasons discussed above with respect to Defendant Belmore, Plaintiff's allegations do not state a due process claim against Defendant Williamson.

### 5.   Defendants Hueske, Erfert, and Weaver

Plaintiff alleges that Defendant Hueske testified that "the shooter was eye level with the rocker panel and that the barrel and Jeep were perpendicular to one another." (Doc. 56 at 12 ¶ 62.) In reaching that conclusion, Defendant Hueske conducted a laser test to determine bullet trajectory. (*Id.* at 11 ¶ 59.) Defendant Hueske determined the angle of the bullet in the rocker panel to be 55-degree horizontal, coming from the rear. (*Id.* ¶ 60.) Plaintiff alleges that Defendants Weaver and Erfert also "concluded" that "the shooter was eye level with the rocker panel and that the barrel and Jeep were perpendicular to one another." (*Id.* at 12 ¶ 62.)

Plaintiff claims that Defendants Hueske, Weaver, and Erfert did not conduct a similar laser test to determine the trajectory of the bullet that entered Charles Thurman's head. (*Id.* ¶ 63.) Plaintiff alleges that Defendants Hueske, Weaver, and Erfert did not check the angles necessary to inflict the fatal gunshot wound. (*Id.* ¶ 65.)

Plaintiff does not allege that Defendants Hueske, Erfert, and Weaver presented false testimony or fabricated evidence or acted in bad faith in conducting the trajectory of the

bullet that hit the Jeep's rocker level.  *Cf. Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (recognizing a § 1983 claim against law enforcement officers for initiating criminal proceedings based on deliberately fabricated evidence).  In addition, the Supreme Court recognized in *Youngblood* that "the police do not have a constitutional duty to perform any particular tests," and when the police fail to perform a particular test, a defendant "is free to argue to the finder of fact" that a test "might have been exculpatory." 488 U.S. at 59.

The Ninth Circuit in *United States v. Westerdahl*, 945 F.2d 1083, 1087 (9th Cir. 1991) considered a claim that the failure of police to preserve potentially exculpatory evidence in a getaway car violated his due process rights.  The Ninth Circuit determined that the forensic examinations of the getaway car "were done in a professional and reasonable manner," and while the defendant "question[ed] the thoroughness of the forensic examination as to bullet trajectories," the police "had no constitutional duty to perform these more sophisticated tests." *Id.* (citing *Youngblood*, 488 U.S. at 59).  Likewise, here, Defendants Hueske, Erfert, and Weaver had no constitutional duty to conduct the trajectory test on the bullet that killed Charles Thurman.  Accordingly, the Court finds that Plaintiff has failed to state a due process claim against Defendants Hueske, Erfert, and Weaver based on the failure to conduct a trajectory of the bullet that killed Charles Thurman.

Plaintiff also alleges that Defendant Hueske relied on Defendant Price's estimate of the Jeep's speed in conducting a crime scene reconstruction.  (Doc. 56 at 13 ¶ 71.)  Using that speed estimation in connection with the rate at which Plaintiff's rifle could fire consecutive shots and the velocity at which the bullets traveled, Defendant Hueske concluded that all three bullets could have been shot from one shooter.  (*Id.* at 13-14 ¶ 72.)

The State Defendants argue that Plaintiff alleges no facts that Defendant Hueske performed tests or provided testimony knowing (or having reason to know) that Plaintiff was innocent, or that the underlying information was unreliable when the tests were conducted.  (Doc. 117 at 10.)  The State Defendants also contend that Plaintiff does not

allege that Defendant Hueske deliberately fabricated any material facts relating to the tests he completed or his trial testimony.  (*Id.*)

In the absence of allegations that Defendant Hueske presented false testimony or fabricated evidence or that he intentionally relied on a speed estimation he knew was inaccurate for the purpose of harming Plaintiff, the Court finds that Plaintiff has not stated a due process claim against Defendant Hueske.

### 6.     Defendant Diffendaffer

Plaintiff's claim against Defendant Diffendaffer is based on Diffendaffer's failure to investigate witness's statements about the night of Charles Thurman's death.   In particular, Plaintiff alleges that several witnesses stated that they heard gunshots or saw muzzle fire coming from Thurman's vehicle.  However, Plaintiff specifically identifies only one witness whom Defendant Diffendaffer interviewed. (Doc. 56 at 26.) That witness stated that after he went to bed, he heard a vehicle and what sounded like gunshots coming from the vehicle.  (*Id.*)  Plaintiff claims that despite this evidence, Defendant Diffendaffer failed to properly investigate the likely possibility that the bullet that struck Thurman could have been fired by a passenger in Thurman's vehicle.  (*Id.*)

In general, there is a presumption that the decision to file criminal charges "result[ed] from an independent determination on the part of the prosecutor, [which] precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (discussing malicious prosecution claim).  As the County Defendants note, Plaintiff has not alleged that Defendant Diffendaffer "deliberately fabricated any aspect of the witness interview, or concealed its existence." (Doc. 114 at 14.)

Plaintiff has not alleged any specific facts to support a conclusion that Defendant Diffendaffer acted in bad faith in conducting the investigation or that he knowingly provided false information to the prosecutor.  Accordingly, Plaintiff has not stated a due process claim against Defendant Diffendaffer.

. . . .

### 7.    Defendant Dannison

Plaintiff alleges that Defendant Dannison started the Jeep, warmed it up, and accelerated it out of gear, which caused a popping through the muffler "on occasion" with the choke activated.  (Doc. 56 at ¶ 147.)  Defendant Dannison turned off the car briefly and was "able to include a backfire, loud bang, and visible flames" by turning the vehicle on while the engine was under compression.  (*Id.* ¶ 149.)  Defendant Dannison testified at trial, in part, concerning the results of his tests on the Jeep.  (*Id.* ¶ 152.)  As the County Defendants point out, Defendant Dannison did not create a report, and Plaintiff does not allege that Dannison fabricated the test results or that Dannison hid his efforts.  (Doc. 114 at 15.)  Plaintiff suggests that Defendant Dannison tested the Jeep in a manner that would cause it to backfire.  However, Plaintiff has alleged no facts to support such a conclusion. Accordingly, Plaintiff has not stated a due process claim against Defendant Dannison.

### 8.    Defendant Mascher

Plaintiff's claim against Defendant Mascher is based on Mascher's participation in the investigation, his position as a supervisor, and his purported failure to adequately train and supervise his subordinates.

#### a.    Investigation

Plaintiff alleges that Defendant Mascher conducted the string trajectory test and subsequently admitted that the string test was inaccurate in this case because it was done outdoors.  (Doc. 56 at 11 ¶¶ 56-58.)  Defendant Mascher also admitted that the string test's flaws led to the faulty conclusion that Plaintiff had been standing at the time the shots that hit the Jeep were fired.  (*Id.* ¶ 56.)  However, Plaintiff alleges that Defendants Hueske, Weaver, and Erfert conducted a "more accurate" laser trajectory test, which determined that "the shooter was eye level with the rocker panel and that the barrel and Jeep were perpendicular to one another."  (*Id.* ¶¶ 59-62.)  Defendant Hueske testified to this conclusion at Plaintiff's trial, and Defendant Mascher "conceded at trial his original assumption that the shooter was standing was incorrect." (*Id.* ¶¶ 62, 64.)  Thus, Plaintiff's allegations do not support a conclusion that he suffered any injury as a result of the string

trajectory test.

Plaintiff also claims that Defendant Mascher did not conduct a complete investigation.  As Defendants note, Plaintiff has not alleged that Defendant Mascher used investigative techniques that were so coercive and abusive that he knew or should have known those techniques would yield false information.  (*Id.*)  Despite Plaintiff's conclusory allegation that Defendant Mascher led the investigation "with the purpose of convicting [Plaintiff] regardless of evidence proving he was innocent," Plaintiff has alleged no specific facts to support a conclusion that Defendant Mascher acted in bad faith in conducting the investigation.

Moreover, Plaintiff's allegations indicate that Defendant Mascher considered evidence that implicated as well as exculpated Plaintiff.  Plaintiff alleges that Defendant Mascher considered the possibility that one of the surviving passengers in the Jeep had discharged a weapon, which had killed Thurman.  Plaintiff also alleges that Thurman was shot in the head with a .22 caliber weapon, and Plaintiff was the only person known to be at the scene of the shooting who possessed a .22 caliber rifle that discharged.  (Doc. 114 at 13.)  Thus, Plaintiff's allegations do not support a conclusion that Defendant Mascher considered only evidence that would implicate Plaintiff.  Accordingly, Plaintiff has not stated a due process claim against Defendant Mascher with respect to Mascher's investigation.

### b.    Supervisory Liability

A supervisor may be liable for failure to act if he participated in or directed a constitutional violation or he knew of the violation and failed to act to prevent it.  *See Maxwell v. County of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013); *cf. Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011) ("[a] plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates").  A supervisor may be liable in his individual capacity under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the

supervisor's wrongful conduct and the constitutional violation."  *Starr*, 652 F.3d at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).  Supervisory liability is direct liability, which requires the plaintiff to show that that supervisor breached a duty to the plaintiff that was the proximate cause of the injury.  *Id.*  A causal connection can be "an affirmative link" between a constitutional deprivation and "the adoption of any plan or policy by [a supervisor,] express or otherwise showing [his or her] authorization or approval of such misconduct."  *See Rizzo v. Goode*, 423 U.S. 362, 371 (1976).

    As discussed above, Plaintiff has not stated a constitutional claim against any named Defendant.  Accordingly, Defendant Mascher is not subject to supervisory liability.

### c.    Failure to Train and Supervise

    To state a claim based on a failure to train or supervise, a plaintiff must allege facts to support that the alleged failure amounted to deliberate indifference.  *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998).  A plaintiff must allege facts to support that not only was particular training or supervision inadequate, but also that such inadequacy was the result of "a 'deliberate' or 'conscious' choice" on the part of the defendant.  *Id.* at 1213-14; *see Clement v. Gomez,* 298 F.3d 898, 905 (9th Cir. 2002) (a plaintiff must allege facts to support that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy[]makers . . . can reasonably be said to have been deliberately indifferent to the need.") (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  A plaintiff must also show a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations omitted).

    As with a supervisory liability claim, Defendant Mascher cannot be held liable for a failure to train or supervise where there is no constitutional violation.  Thus, the Court finds that Plaintiff has not stated a claim against Defendant Mascher.

    In light of the Court's conclusion that Plaintiff has not a stated against any individual Defendant, the Court need not considered whether Defendants are entitled to qualified

1    immunity.

2    **C.    Yavapai County**

3    "A municipality may not be sued under § 1983 solely because an injury was inflicted

4    by its employees or agents." *Long v. County of L.A.,* 442 F.3d 1178, 1185 (9th Cir. 2006).

5    The actions of individuals may support municipal liability only if the employees were

6    acting pursuant to an official policy or custom of the municipality. *Botello v. Gammick*,

7    413 F.3d 971, 978-79 (9th Cir. 2005).   Thus, a plaintiff must allege that a municipal

8    efendnat "had a deliberate policy, custom, or practice that was the moving force behind the

9    constitutional violation [they] suffered." *See Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th

10   Cir. 2007).

11   Because the Court has found that Plaintiff did not suffer any constitutional injury,

12   his *Monell* claim against Yavapai County necessarily fails. *See Los Angeles v. Heller*, 475

13   U.S. 796, 799 (1986) (holding that the mere existence of a policy or custom that disregards

14   constitutional rights cannot support money damages absent a showing of individualized

15   constitutional injury at the hands of the police); *Cairns v. County of El Dorado*, 694 Fed.

16   App'x 534 (9th Cir. 2017) (mem.) (concluding that *Monell* claim failed because there was

17   "no underlying constitutional violation").   Thus, the Court finds that Plaintiff has not stated

18   a claim against Defendant Yavapai County.

19   **D.    Leave to Amend**

20   Plaintiff asserts that if the Court grants the Motion for Judgment on the Pleadings,

21   where Defendants have raised qualified immunity for the first time, the Court should grant

22   Plaintiff leave to amend under the same liberal standard as it would if granting a motion to

23   dismiss.  (Doc. 122 at 3.)  Defendants do not address whether dismissal should be with or

24   without leave to amend.

25   Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, the Court may grant

26   leave to amend "freely" "when justice so requires."  A dismissal without leave to amend is

27   improper unless it is beyond doubt that the complaint "could not be saved by any

28   amendment." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009).  "Leave to amend

is warranted if the deficiencies can be cured with additional allegations that are 'consistent with the challenged pleading' and that do not contradict the allegations in the original complaint."   *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (quoting *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990)).

The Court finds leave to amend is warranted here.   Thus, the Court will grant Plaintiff leave to file a second amended complaint.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion to Dismiss (Doc. 114).

(2)     Defendants' Motion to Dismiss (Doc. 114) is **granted**, and the Amended Complaint is **dismissed without prejudice**.

(3)     Within **30 days** of the filing date of this Order, Plaintiff may file a second amended complaint.

Dated this 11th day of February, 2021.

Michael T. Liburdi
United States District Judge