JL

WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Jason Derek Krause,

Plaintiff,

v.

Yavapai County, et al.,

Defendants.

No.  CV 19-08054-PCT-MTL (ESW)

**ORDER**

Plaintiff Jason Derek Krause, through counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[1]  Defendant Edward Hueske has filed a Motion to Dismiss Plaintiff's Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 137.)  Defendants Yavapai County, Scott Mascher, Mike Dannison, Dennis Price, and Roger Williamson have filed a separate Motion to Dismiss the Second Amended Complaint pursuant to Rule 12(b)(6).  (Doc. 138.)  Plaintiff opposes the Motions.  (Docs. 147, 153.)  The Court will grant the Motions and dismiss the Second Amended Complaint and this action.

## I.    Background

After a jury trial in 1996, Plaintiff was found guilty of manslaughter in connection

---

[1] Plaintiff sued Federal Bureau of Investigation Special Agent Ernest Peele pursuant to *Bivens*.  In an April 3, 2020 Order, the Court granted Peele's Motion to Dismiss and dismissed Peele as a Defendant.  (Doc. 83.)  On June 22, 2021, the Ninth Circuit Court of Appeals affirmed the Court's April 3, 2020 Order dismissing Defendant Peele.  (Doc. 154.)

with the shooting death of Charles Thurman.  (*See* Doc. 130 at 3.)[2]  Plaintiff was sentenced to a 10.5-year term of imprisonment.  (*Id.*)[3]

In 2015, the Arizona Court of Appeals overturned Plaintiff's conviction, finding that newly discovered evidence regarding comparison of the lead content of bullets probably would have changed the verdict.  *State v. Krause*, 2015 WL 7301820 (Ariz. Ct. App. Nov. 19, 2015).  On March 1, 2017, the Yavapai County Clerk entered the Superior Court's Order of Dismissal, dismissing the charges against Plaintiff.

Plaintiff filed this action on February 20, 2019.  (Doc. 1.)  On August 21, 2019, he filed an Amended Complaint.  (Doc. 56.)  Defendants filed a Motion for Judgment on the Pleadings.  (Docs. 115-117.)  In a February 11, 2021 Order, the Court granted Defendants' Motion for Judgment on the Pleadings and gave Plaintiff leave to file a second amended complaint.  (Doc. 130.)  On March 15, 2021, Plaintiff filed the Second Amended Complaint.  (Doc. 131.)

## II.    Federal Rule of Civil Procedure 12(b)(6)

Dismissal of a complaint, or any claim within it, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).  In determining whether a complaint states a claim under this standard, the allegations in the complaint are taken as true and the pleadings are construed in the light most favorable to the nonmovant. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007).  A pleading must contain "a short and plain statement of the claim showing that the pleader is

---

[2] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

[3] *See* https://apps.supremecourt.az.gov/publicaccess/caselookup.aspx (search by case number P-1300-CR-940374 in Yavapai County Superior Court) (last accessed Oct. 21, 2021).

entitled to relief." Fed. R. Civ. P. 8(a)(2). But "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation omitted). To survive a motion to dismiss, a complaint must state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

As a general rule, when deciding a Rule 12(b)(6) motion, the court looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). If a court considers evidence outside the pleading, it must convert the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). A court may, however, consider documents incorporated by reference in the complaint or matters of judicial notice without converting the motion to dismiss into a motion for summary judgment. *Id.*

## III.   Second Amended Complaint

In his Second Amended Complaint (SAC), Plaintiff alleges the following:

### A.   Death of Charles Thurman

On the evening of June 24, 1994, Plaintiff was standing in his front yard with his .22 rifle, looking for skunks that had been getting into his family's chicken coop, when he heard gunfire and a loud vehicle coming down the road toward him and his home. (Doc. 131 at 6 ¶ 19.) As Plaintiff's neighbors told police, they also saw a vehicle, an open-top Jeep, speeding down the road toward Plaintiff's home, and they heard gunfire and saw muzzle fire from the Jeep as it passed their homes. (*Id.* ¶ 20.) Plaintiff told police and later testified at his criminal trial that as the Jeep approached his property and the gunfire from

1    it continued, he fell to the ground and tried to cover his head.  (*Id.* ¶ 21.)  When Plaintiff

2    fell to the ground, his .22 rifle accidentally discharged once.  (*Id.* ¶ 22.)

3         As the Jeep approached Plaintiff's house, it veered off the road and came to rest

4    after colliding with Plaintiff's truck.  (*Id.* ¶ 24.)  Charles Thurman, the Jeep's driver, was

5    slumped over the steering wheel.  (*Id.* ¶ 25.)  He had been shot in the head.  (*Id.*)  There

6    were three other passengers in the Jeep: T.E., who was seated in the front passenger seat;

7    A.M., who was seated in the backseat behind T.E.; and S.C., who was seated in the backseat

8    behind Charles Thurman.  (*Id.*)  The bullet entered from behind and above Thurman's left

9    ear and exited above his left eye, in a slight downward trajectory.  (*Id.* ¶ 26.)  There were

10   also apparent bullet impacts to the Jeep's rocker panel and left-rear tire.  (*Id.* at 7 ¶ 27.)

11        After the Jeep crashed, and before he was aware that anyone was hurt, Plaintiff

12   asked a girl from the Jeep who approached him why they were "doing a drive by" on his

13   house.  (*Id.* ¶ 28.)  After hearing that Thurman was shot, Plaintiff immediately went inside

14   to dial 911, and alert his wife, a paramedic, to check on Thurman's condition.  (*Id.* ¶ 29.)

15   When questioned by police on the night of the shooting, Plaintiff admitted that his rifle had

16   discharged, explaining that it was accidental, and had occurred as he fell to the ground and

17   tried to cover his head as the gunfire-emitting Jeep approached him.[4]  (*Id.* ¶ 30.)

18        **B.    Investigation of Crime Scene**

19        Defendant Scott Mascher, who was then a Yavapai County Sheriff's Office (YCSO)

20   Lieutenant, upon arriving at the scene of the shooting, believed the individuals in the Jeep

21   may have had a gun that they discharged, striking Thurman.  (*Id.* at 8 ¶ 35.)  Defendant

22

23        [4]  The Arizona Court of Appeals described the facts underlying Plaintiff's
     conviction, in part, as follows: "[Plaintiff] gave conflicting accounts about the shooting.
24   He first stated that he had heard what sounded like gunshots, heard the crash and then called
     911.  Later, he revised his account to say that when he heard what he thought were
25   gunshots, he fell to the ground and the rifle he was carrying accidentally discharged.  Two
     days later, he again revised his story to say that his rifle may have discharged more than
26   once.  Investigators found a shell casing in a thick, brushy area of [Plaintiff's] front yard
     much closer to the road than where he claimed to have fallen to the ground."  *State v.*
27   *Krause*, No. 2 CA-CR 2015-0326-PR, 2015 WL 7301820, at *1 (Ariz. Ct. App. Nov. 19,
     2015).

28

- 4 -

Mascher asked YCSO Detective Dan Martin[5] about getting a facility from outside Yavapai County to test the occupants of the Jeep for gunshot residue, but Mascher failed to conduct the test.  (*Id.*)  Mascher testified at Plaintiff's trial that he believed a teenager in the Jeep was a suspect and that he knew Thurman had been struck by a bullet when interviewing the teenager.  (*Id.* ¶ 36.)

Defendant Mascher noted the Jeep's rocker panel had been struck by a bullet, which he believed "was connected to the bullet that killed Thurman," but Mascher failed to preserve the rocker panel and determine if there were bullet fragments inside it.  (*Id.* ¶ 37.)  Mascher did not "review[]" the rocker panel to see if he could remove it and determine if there was a bullet fragment still inside it.  (*Id.* at 9 ¶ 38.)  Mascher supervised the towing of the Jeep, allowing it to be towed back and forth from the scene to the service center repeatedly before reviewing the rocker panel.  (*Id.*)  Mascher "watched and allowed" the Jeep to be towed at an angle, rather than on a flatbed, despite the probability that the bullet fragments in the rocker panel would be dislodged by the towing.  (*Id.*)

Defendant Mascher personally collected or otherwise had personal knowledge of multiple witness statements, in which witnesses reported having seen a second car following the Jeep at or around the same time Thurman was shot.  (*Id.* ¶ 39.)  Mascher failed to investigate who was driving the second vehicle and whether he had a gun.  (*Id.*)

Defendant Mascher allowed Detective Martin to handle the gun Plaintiff was holding the night of the shooting before taking photographs of the gun's condition and location.  (*Id.* at 10 ¶ 43.)  Mascher allowed Detective Martin to move the gun from its position on the ground with dirt and leaves, thus "destroying" the crime scene, the leaves on the gun, and the condition of the gun.  (*Id.*)  Subsequently, Defendant Mascher and Detective Martin placed Plaintiff's gun back in the position they found it to videotape its

---

[5] Detective Martin was named as a Defendant in the Amended Complaint.  (Doc. 56.)  On May 12, 2020, Plaintiff filed a Notice of Dismissal of Defendant Martin.  (Doc. 89.)

location.  (*Id.* ¶ 44.)  Mascher removed the leaves that "collected" on the gun and failed to preserve them.  (*Id.*)

Detective Martin found one shell casing in Plaintiff's front yard while Defendants Mascher and Williamson were present.  (*Id.* ¶ 45.)  There was a bullet hole in the right front rocker panel of the Jeep and a bullet hole in one of the Jeep's rear tires.  (*Id.* at 11 ¶ 45.) Mascher testified at Plaintiff's trial that Detective Martin had measured the area where the casing was found but no officer filed a supplemental report regarding the measurement. (*Id.*)  Defendant Price testified that officers recorded at least 86 measurements of the scene, but not of the shell location.  (*Id.*)  Defendant Price testified at Plaintiff's trial that Defendants did not measure the location of Plaintiff's van, with which the Jeep had collided, until two days after the crash.  (*Id.* at 14 ¶ 58.)

Defendants Mascher and Price, along with Detective Martin, used a metal detector to search for bullet casings in Plaintiff's yard, but none of them used the metal detector to search the road the Jeep was driving on for bullets.  (*Id.* at 12 ¶ 48.)  Price and Mascher knew, based on fragments in the Jeep's rocker panel and the bullet found in Thurman's body, that multiple shots had been fired.  (*Id.* ¶ 49.)  Price and Mascher knew there was only one casing in Plaintiff's yard, so they knew he could not have discharged his weapon more than once, and they suspected the passengers in the Jeep may have fired the bullets that killed Thurman.  (*Id.* ¶¶ 50-51.)  At the time Detective Martin used the metal detector, Price and Mascher knew it was likely the teenagers fired a weapon from the Jeep and that there may have been casings on the roadway, but Price and Mascher failed to search for casings in the Jeep and roadway.  (*Id.* ¶ 52.)

Defendant Mascher testified at Plaintiff's trial that officers found other metal fragments at the crime scene that likely were bullets, but they never placed the fragments into evidence.  (*Id.* at 13 ¶ 55.)  Mascher knew the fragments could have been bullet fragments fired by the passengers in the Jeep, but he did not collect them.  (*Id.*)

Defendant Roger Williamson, a Yavapai County Attorney's Office Investigator,

testified at trial that shortly after the incident, he observed several .22 caliber casings and at least one unspent .22 bullet in the rear seat area of the Jeep. (*Id.* at 28 ¶ 129.) Williamson never photographed or inventoried the Jeep's contents, contrary to "standard police procedure." (*Id.* ¶ 130.) Williamson testified that the Jeep's contents should have been photographed in the routine course of such an investigation. (*Id.* ¶ 131.) Williamson also testified that he saw beer cans, multiple cartridges, and possibly fired casings of a small caliber in the back of the Jeep. (*Id.* ¶ 132.) Williamson knew this evidence was not inventoried but failed to preserve the evidence. (*Id.*) Williamson testified that the casings he found were .22 Remington manufactured bullets, not the "Super X Winchester .22" casings that Plaintiff owned and provided to Defendants. (*Id.* ¶ 133.) Williamson did not prepare a report that stated that he had found empty beer cans and different model .22 bullet casings in the Jeep. (*Id.* at 29 ¶ 136.)

One month after being sent to the impound lot, the Jeep was burglarized, and the .22 casings and rounds were stolen, along with the Jeep's stereo and speakers. (*Id.* at 30 ¶ 144.) In March 1996, Defendant Williamson returned to the Jeep specifically to search for the casings because he knew they had never been collected.[6] (*Id.* ¶ 145.) Williamson discovered the spent bullet casings had been stolen from the Jeep, but one unspent .22 caliber bullet remained in the Jeep. (*Id.*) Williamson collected the unspent bullet. (*Id.*)

### C.    String Trajectory Test

Defendant Mascher conducted a "string" trajectory test on June 27, 1994 to establish that the trajectory proved the bullet came from Plaintiff's rifle. (*Id.* at 15 ¶ 64.) Mascher conducted the "string" test with the assistance of Defendant Williamson, YCSO Detective Martin, and YCSO Officer Belmore.[7] (*Id.* ¶ 65.) To create the rod the string was attached

---

[6] Plaintiff does not allege why Defendant Williamson returned to the Jeep in March 1996.

[7] Officer Belmore was named as a Defendant in the Amended Complaint, but he is not named in the Second Amended Complaint.

to for the string test, Defendant Mascher instructed Detective Martin to weld the rod in his own home, without supervision, using a lathe he personally owned.  (*Id.* ¶ 66.)  Mascher did not confirm the lathe was in proper condition or that Detective Martin's "welding experience was sufficient."  (*Id.*)

After conducting the "string" test, Defendants Mascher and Williamson concluded in a report that the bullet that hit the Jeep rocker panel was shot from a standing position, that Plaintiff must have fired two shots, and that he did so intentionally.  (*Id.* at 16 ¶ 68.)  Defendant Mascher knew the results of the test were inaccurate because it was performed outside, where the string was more likely to bow and flex, and with a "faulty" rod.  (*Id.*)  At Plaintiff's trial, Mascher testified that, because of the distance between the shooting position and the Jeep (approximately 140 feet), the string was an inaccurate device because it naturally bowed and flexed.  (*Id.* ¶ 71.)

### D.   Laser Trajectory Test

After Plaintiff was indicted on June 30, 1994, Defendant Edward Hueske, who was employed by the Arizona Department of Public Safety (DPS) Crime Lab, conducted a laser analysis to determine an accurate trajectory of the bullet that hit the rocker panel.  (*Id.* at 17 ¶ 73.)  In analyzing the bullet trajectory, Hueske relied on photos of the vehicle and the undisputed position of Plaintiff in his yard.  (*Id.*)  Hueske calculated "both vertical and horizontal angles and determined the angle of the bullet in the rocker panel to be 55-degree horizontal, coming from the rear."  (*Id.* ¶ 74.)  Hueske applied a laser test to get an accurate bullet trajectory.  (*Id.* ¶ 75.)  Based on that laser test, as Hueske testified at Plaintiff's trial, Hueske concluded that "the shooter was eye level with the rocker panel and that the barrel and Jeep were perpendicular to one another."  (*Id.* ¶ 76.)  Hueske never conducted a similar laser test to determine the trajectory of the bullet that entered Charles Thurman's head.  (*Id.* ¶ 77.)

Following Defendant Hueske's testimony, Defendant Mascher "retracted his original assumption" that Plaintiff had been standing when his gun discharged and testified

1    that the shot came from ground level.  (*Id.* ¶ 79.)

2        **E.    Drag Sled Test**

3        Defendant Price used a drag sled to estimate the Jeep's speed based on partial

4    information.  (*Id.* at 23 ¶¶ 103-04.)  In conducting the test, Defendant Price failed to

5    consider the loss of speed during the Jeep's impact with Plaintiff's truck when making his

6    determination of the Jeep's speed; failed to consider the relative weight of the Jeep and the

7    truck when making his determination of the Jeep's speed; and failed to consider the fact

8    that Plaintiff's truck was locked in gear.  (*Id.* ¶¶ 105-07.)  Defendant Price's speed

9    conclusions "slowed down the Jeep" so that Plaintiff "could have fired off three rounds in

10   the time the Jeep passed Plaintiff's house."  (*Id.*)  Defendant Price prepared an expert report

11   stating his conclusions.  (*Id.* at 25 ¶ 115.)  According to Plaintiff, Price "purposefully

12   performed this speed test recklessly, lacking proper qualifications, and ignoring material

13   statistics to determine speed more reliably in order to produce an inaccurate report to frame

14   [Plaintiff]."  (*Id.* ¶ 112.)

15       **F.    Witness Statements and Evidence of Third-Party Culpability**

16       Other than talking to the three passengers who were in the Jeep with Charles

17   Thurman, investigating law enforcement representatives did not investigate the possibility

18   that an occupant of the Jeep fired the bullet that killed Charles Thurman.  (*Id.* at 26 ¶ 122.)

19   The passengers made statements that they all had been drinking, including Thurman, on

20   the night of June 24, 1994.  (*Id.* ¶ 123.)  One of the passengers, S.C., testified at Plaintiff's

21   trial that after the Jeep crashed into Plaintiff's truck, the passengers threw beer cans into

22   the creek.  (*Id.* at 27 ¶ 124.)  Another passenger, T.E., admitted that after the Jeep crashed

23   into Plaintiff's truck, he buried beer cans in the creek.  (*Id.* ¶ 125.)  Defendants Mascher,

24   Williamson, and Price failed to investigate whether the occupants of the Jeep may have hid

25   firearms when they hid their beer by the creek.  (*Id.* ¶ 127.)

26       Defendant Mascher knew witnesses reported hearing gunshots and seeing muzzle

27   fire coming from the Jeep but failed to investigate whether one of the teenagers in the Jeep,

28

or another person in a car following the Jeep, could have been the responsible party.  (*Id.* ¶ 126.)  Mascher did not investigate whether one of the passengers in the Jeep, or another person in a car following the Jeep, could have been the responsible party.  (*Id.*)

Defendant Mascher directed Detective Martin and Officer Diffendaffer to interview witnesses.  (*Id.* at 34 ¶ 167.)  Various people who lived or camped in the vicinity recalled significant gunfire and muzzle flash associated with the Jeep at various times of that night.  (*Id.*)  None of the witnesses "refuted the reports that there was gunfire coming from the Jeep."  (*Id.*)  Mascher failed to follow up on statements from numerous witnesses that there was another car following Thurman's Jeep, which could have been firing a weapon.  (*Id.* at 37 ¶ 169.)

### G.  Evidence in the Jeep

Defendant Williamson testified at Plaintiff's trial that shortly after the incident, in June 1994, he observed several .22 caliber casings and at least one unspent .22 bullet in the rear seat area of the Jeep.  (*Id.* at 28 ¶ 129.)  Williamson never photographed or inventoried the Jeep's contents and did not book the bullet and casings into evidence, contrary to standard police procedure.  (*Id.* ¶ 130.)  Williamson testified that the Jeep's contents should have been photographed in the routine course of such an investigation.  (*Id.* ¶ 131.)

Defendant Williamson testified that he saw beer cans, multiple cartridges, and possibly fired casings of a small caliber in the back of the Jeep.  (*Id.* ¶ 132.)  Williamson knew this evidence was not inventoried but failed to preserve the evidence.  (*Id.*)  Williamson testified that the casings he found were .22 Remington manufactured bullets, different from the "Super X Winchester .22" casings that Plaintiff owned and provided to Defendants.  (*Id.* ¶ 133.)  Williamson knew Defendant Mascher believed there was a high likelihood that the teenagers in the Jeep had a gun and testified that part of his investigation was to determine whether there was a gun in the Jeep.  (*Id.* ¶ 134.)

Defendant Williamson did not write a report that he found empty beer cans and different model .22 bullet casings in the Jeep.  (*Id.* at 29 ¶ 136.)  He testified at Plaintiff's

trial that he knew the Jeep had already been processed and therefore knew that if he did not collect the evidence in the Jeep, no other officer would because they were done processing the Jeep. (*Id.* ¶ 137.) Mike Winney, a YCSO property and identification supervisor, accompanied Defendant Williamson. (*Id.* ¶ 138.) Williamson knew Winney either never saw the casings or failed to collect them for evidence. (*Id.*)

Defendants knew there was a high likelihood that evidence would be stolen from the Fleet Management yard where they left the Jeep. (*Id.* ¶ 139.) Defendant Dannison testified that it was "not unusual for things to get stolen out of that impound lot" at the time they placed the Jeep in it. (*Id.* ¶ 137.) When asked whether the impound lot was a secure area, Dannison testified, "[w]e have had a few break-ins." (*Id.*) Dannison, and "possibly" other Defendants, including Defendant Williamson, had reason to know leaving evidence, such as bullets and shell casings, in the Jeep in an insecure impound lot would lead to the destruction of evidence. (*Id.* ¶ 140.)

## H.    Testing of Jeep

On June 26, 1994, Detective Martin went to the impound lot where the Jeep had been stored. (Doc. 131 at 38 ¶ 173.) Martin started the vehicle, left it idling, revved the engine to about 2,000 RPM, and then let the gas off, but the Jeep did not backfire.[8] (*Id.*) Martin prepared a supplemental report in connection with his first attempt to make the Jeep backfire. (*Id.*)

---

[8] In its decision affirming Plaintiff's conviction, the Arizona Court of Appeals set forth the facts underlying the conviction:

Four young people were returning to Prescott after an evening of four-wheeling in the back country. [T.], the driver, often purposefully caused the vehicle to backfire. As the jeep passed Krause's home two backfires sounded. After the second backfire, [T.] was shot, lost control of the jeep and crashed it into a parked truck. He was taken to the hospital and pronounced brain-dead as the result of a gunshot wound to the head. An examination of the jeep indicated two .22 caliber bullet hits on the vehicle, one to the running board, the other to left rear tire.

*State v. Krause*, No. 2 CA-CR 2015-0326-PR, 2015 WL 7301820, at *1 (Ariz. Ct. App. Nov. 19, 2015).

On July 7, 1994, Detective Martin and Defendant Dannison returned to the impound lot "to try and get the Jeep to backfire to develop evidence exculpating the passengers and implicating [Plaintiff]." (*Id.* ¶ 174.) Dannison "wanted to make the Jeep backfire to provide an excuse for why twelve witnesses heard loud noises that did not point to gunshots to defeat the idea someone other than [Plaintiff] fired a gun, and conducted the test in a fabricated manner to achieve the desired test results." (*Id.*)

Defendant Dannison, with the assistance of Martin, started the Jeep, let it warm up, and accelerated it while it was out of gear. (*Id.* ¶ 75.) While the choke was still activated, the vehicle popped through the mufflers on occasion, but it was not consistent. (*Id.*) The sound was not loud; it was more like a hiss. (*Id.*) Dannison and Martin then turned the car off briefly, turned it back on while the engine was on compression, and the Jeep backfired with a loud bang that sounded like a shot and sent out a visible flame. (*Id.*) Thereafter, they made the Jeep backfire multiple times, with varying sounds and successions. (*Id.*) However, there was no flame after the first backfire. (*Id.*) Detective Martin noted in his police report that he had interviewed a mechanic, Edward Jestilia, who was at the scene on the night Thurman was shot, and Jestilia told Martin it was impossible the noises were backfires. (*Id.*) According to Plaintiff, Dannison knew about Jestilia's conclusion based on Detective Martin's interview. (*Id.* at 39 ¶ 176.)

Detective Martin, under Defendant Mascher's "direction and control," and with the assistance of Defendant Dannison, "fabricated test results and a report based on compressing the Jeep's engine" to "assert the Jeep backfires regularly and that this was the reason witnesses at the scene heard gunshot noises," despite knowing this explanation was impossible based on Jestilia's knowledge of automobile and being at the scene. (*Id.* ¶ 177.) Defendant Dannison testified at Plaintiff's trial about his and Detective Martin's "efforts to make the Jeep backfire in a fashion that sounded like a gunshot."[9] (*Id.*)

---

[9] Detective Martin was unavailable to testify at Plaintiff's trial because he suffered a stroke that caused severe memory loss. (Doc. 131 at 37 ¶ 170.)

1
2

**IV.    Defendants Yavapai County, Mascher, Dannison, Price, and Williamson's Motion to Dismiss**

3
4
5

Defendants Yavapai County, Mascher, Dannison, Price, and Williamson argue that they did not violate Plaintiff's due process rights, and, in any event, they are entitled to qualified immunity as to Plaintiff's claims.

6

**A.    Qualified Immunity Standard**

7
8
9
10
11
12
13
14

Officers are entitled to qualified immunity under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Thus, if the Court finds no violation of a constitutional right, the Court need not consider whether that right was "clearly established at the time." *Id.*; *see Pearson v. Callahan*, 555 U.S. 223, 230–32, 235–36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

15

**B.    Substantive Legal Standards**[10]

16

**1.    Fabrication of Evidence**

17
18
19
20
21
22
23
24
25

In *Pyle v. Kansas*, 317 U.S. 213 (1942), the Supreme Court held that the knowing use by the prosecution of perjured testimony to secure a criminal conviction violates the Constitution. *Id.* at 216. In *Miller v. Pate*, 386 U.S. 1, 7 (1967), the Supreme Court observed that "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." In *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001), the Ninth Circuit held "that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Id.* at 1074-75.  The Ninth Circuit in *Devereaux* found that "the wrongfulness of charging someone on the basis of deliberately

26

---

27
28

[10] The Court relies on the standards employed as of the date the relevant conduct occurred.

1    fabricated evidence is sufficiently obvious, and *Pyle* is sufficiently analogous, that the right

2    to be free from such charges is a constitutional right." *Id.* at 1075.  Thus, in 1994, Supreme

3    Court precedent would have informed Defendants that charging or convicting a person

4    based on deliberately fabricated or false evidence was a due process violation.[11]

### 2.    Disclosure of Potentially Exculpatory Evidence

6           A criminal defendant has a constitutionally protected privilege to request and obtain

7    from the prosecution evidence that is either material to the guilt of the defendant or relevant

8    to the punishment to be imposed. *Brady v. Maryland*, 373 U.S. 83 (1963).  The prosecution

9    also has a constitutional duty to turn over exculpatory evidence that would raise a

10    reasonable doubt about the defendant's guilt, regardless of whether the defendant requests

11    it. *United States v. Agurs*, 427 U.S. 97, 112 (1976).

### 3.    Destruction, Failure to Preserve, and Failure to Collect Potentially Exculpatory Evidence

14           In *California v. Trombetta*, 467 U.S. 479 (1984), the Supreme Court considered

15    whether the Due Process Clause requires the state to preserve potentially exculpatory

16    evidence on behalf of defendants. *Id.* at 481.  The Supreme Court concluded that the failure

17    to preserve breath samples used to perform an Intoxilyzer test did not violate the Fourteenth

18    Amendment because the officers did not destroy the breath samples "in a calculated effort

19    to circumvent the disclosure requirements established by" *Brady* and its progeny; rather,

20    the officers acted "'in good faith an in accord with their normal practice.'"  *Id.* at 487

21    (quoting *Killian v. United States*, 368 U.S. 231 (1961)).  The Supreme Court concluded

22    that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty

---

[11] In *Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017), the Ninth Circuit observed that deliberate fabrication of evidence can be established by circumstantial evidence, such as evidence that officials "continued their investigation of [a person] despite the fact that they knew or should have known that he was innocent." *Id.* at 793 (quoting *Devereaux*, 263 F.3d at 1076).  Fabrication of evidence can also be shown by direct evidence, for example, when an interviewer deliberately mischaracterizes witness statements in her investigative report. *Id.* (citation omitted).

must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488. "To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489; *see Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015) (holding that in 1984, "circuit precedent clearly established that police officers were bound by *Brady*'s disclosure requirements").

In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Supreme Court, expanding on *Trombetta*, held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n.\*. In *Youngblood*, police officers collected a rectal swab and clothing on the night that a child was sexually assaulted but failed to refrigerate the clothing or to perform tests on the semen samples from the rectal swab. *Id.* The Supreme Court stated the officers' failure to preserve the evidence "can at worst be described as negligent." *Id.* In addition, the information was not concealed from the defendant, and the evidence was made available to the defense for testing. *Id.* Thus, the Court concluded, the failure to preserve the evidence did not violate the defendant's due process rights.

One year after *Youngblood*, in *Mitchell v. Goldsmith*, 878 F.2d 319 (9th Cir. 1989), the Ninth Circuit concluded that police did not fail to preserve evidence in bad faith where the police did not know whether a semen sample would have exculpated the defendant when they failed to perform further testing and failed to refrigerate the sample; the police followed departmental procedure in not sending the sample to the FBI given that no suspect had been identified; and the police department itself lacked the capability to perform the tests. *Id.* at 322.

In *United States v. Heffington*, 952 F.2d 275 (9th Cir. 1991), the Ninth Circuit concluded that police had not failed in bad faith to preserve laboratory items allegedly used to manufacture methamphetamine.  The court observed that bad faith can be shown where "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.* at 281 (quoting *Youngblood*, 488 U.S. at 58).  The Ninth Circuit also stated that a police department's compliance with "departmental procedure" should be regarded as an indication that the disposal of evidence was not performed in "bad faith." *Id.* (quoting *Mitchell*, 878 F.2d at 322).

The year before the investigation into Thurman's death, the Ninth Circuit concluded in *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993), that the government, in bad faith, had failed to preserve potentially exculpatory laboratory equipment.  *Id.* at 932.  The defendants were alleged to have manufactured methamphetamine, and they claimed the equipment seized—and later destroyed by the government—could not be used to manufacture methamphetamine.  *Id.* at 929.  The Ninth Circuit found bad faith where the equipment's value as potentially exculpatory evidence was repeatedly suggested to government agents, including by one defendant's parole officer; and the government agents told defendants' counsel that the equipment was held as evidence, although the agents knew it had been destroyed.  *Id.* at 931.  The Ninth Circuit also found that the defendants did not have a "comparable, alternative means to support their assertion of innocence." *Id.*

### 4.    "Reckless Investigation"

To the extent Plaintiff has attempted to state a claim based on a "reckless investigation," such a claim does not rise to the level of a due process violation.  The Supreme Court has held that "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)).  The "Due Process Clause is simply not implicated by a negligent act of an official causing unintended

- 16 -

loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986). And, as Plaintiff recognizes, there is no constitutional due process right to "have [an] investigation carried out in a particular way." *Devereaux*, 263 F.3d at 1075.

### C.  Mascher

#### 1.  Fabrication of Evidence

##### a.  Gunshot Residue

Plaintiff alleges that Defendant Mascher intentionally failed to test for gunshot residue despite being able to because he "knew or was recklessly indifferent" to the fact that results showing gunshot residue on the teenagers would be exculpatory to Plaintiff and would point to third-party liability. (Doc. 131 at 8 ¶ 35.) According to Plaintiff, by failing to test for gunshot residue, Defendant Mascher deliberately destroyed evidence that potentially could have exculpated Plaintiff and would point to third-party liability. (*Id.*) Plaintiff alleges that Mascher believed a teenager in the Jeep was a suspect and knew Thurman had been struck by a bullet when interviewing the teenager but did nothing to "determine scientifically or to preserve evidence to determine whether or not" the teenager fired a weapon because he knew that such evidence would or could be exculpatory to Plaintiff. (*Id.* ¶ 36.)

Defendants argue in their Motion that the conduct attributed to Defendant Mascher with respect to the gunshot residue was not fabrication or concealment of exculpatory evidence, or the destruction of evidence that had an exculpatory value that was apparent at the time. (Doc. 138 at 13-14.) The Court agrees. Defendant Mascher's failure to test the occupants of the Jeep for gunshot residue cannot be characterized as fabrication, concealment, or destruction of potentially exculpatory evidence. Plaintiff's claim that Mascher *could have* but did not test for gunshot residue is, at best, a reckless investigation claim. Moreover, Plaintiff alleges that testing for gunshot residue "could have . . . point[ed] to third-party liability," but he does not explain how the results of any testing could have exculpated him. Even if the teenager whom Mascher believed was a suspect had gunshot

- 17 -

residue on him, Plaintiff does not allege how that would have *exculpated* him.  Indeed, Plaintiff admitted his shotgun discharged once and alleges that multiple witnesses reported hearing gunshots come from the Jeep.  Assuming it is true that gunshots came from the Jeep, one would expect to find gunshot residue on one of the occupants of the Jeep; that does not change the fact that Plaintiff's gun also discharged and therefore could have killed Thurman.

Citing *Smith v. Wade*, 461 U.S. 30 (1983), Plaintiff argues that even if Defendant Mascher "acted recklessly, he is still liable." (Doc. 153 at 14.)  *Smith* is inapposite.  There, the Supreme Court held that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Id.* at 56.  *Smith* did not involve a claim that an officer performed a reckless criminal investigation; it involved a claim that prison officials violated the plaintiff's Eighth Amendment rights by failing to protect him from being assaulted by other prisoners.  *Id.* at 32.  The mere appearance of the word "reckless" in a pre-1994 opinion in a § 1983 case does not mean Mascher may be held liable for a purportedly "reckless" criminal investigation.

Plaintiff further contends Mascher's failure to perform the gunshot residue test was "an investigative technique so 'coercive or abusive' that Mascher knew it would help to convict an innocent defendant."  (Doc. 153 at 14.)  However, the case in which the "coercive or abusive" language appears—*Devereaux*—involved officers eliciting false testimony from children by using coercive interviewing techniques.  *Devereaux* does not support Plaintiff's claim that Mascher "fabricated" evidence by failing to perform specific testing.

In *Devereaux*, the plaintiff alleged that law enforcement officers who interviewed children in a sex abuse investigation elicited false testimony from the children, which resulted in the plaintiff being charged with abuse.  The Ninth Circuit assumed that the

plaintiff had raised a deliberate-fabrication-of-evidence claim based on the interviews of the children and that to support such a claim, the plaintiff "must, *at a minimum,* point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [the plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Id.* at 1076.  The Ninth Circuit described an interview in which a victim, A.S., initially denied being a victim of abuse but later changed her story and accused the plaintiff.  *Id.* at 1077.  The interviewer repeatedly admonished A.S. to tell the truth.  *Id.*   The Ninth Circuit observed, "It is difficult to see, however, how repeated admonitions to be truthful can amount to a constitutional violation for deliberate fabrication of evidence, in the absence of any independent allegations or evidence that [the interviewer] knew or should have known that Devereaux was innocent and that A.S., in testifying to that effect, had already told the truth." *Id.*

Here, Plaintiff has not alleged that Defendants used "coercive and abusive" investigative techniques to obtain false testimony or to coerce a confession from Plaintiff. It is not at all clear that the analysis in *Devereaux* can be applied to a claim that officers in a criminal investigation failed to perform certain tests that *might* have yielded results that tended to exculpate a suspect.[12]

In sum, as the Ninth Circuit recognized in *Devereaux*, "[f]ailing to . . . carry out an investigation in a manner that will ensure an error-free result is one thing; intentionally fabricating false evidence is quite another." *Id.* at 1076-77.  The Court finds Plaintiff has not stated a fabrication-of-evidence claim against Defendant Mascher with respect to testing for gunshot residue.

---

[12] Indeed, in *Hall v. City of Los Angeles*, 697 F.3d 1059, 1069 (9th Cir. 2012), the Ninth Circuit observed that all its published cases that follow *Devereaux* concern interview techniques used to elicit evidence from third-party witnesses.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.    String Trajectory Test

Plaintiff alleges that Defendant Mascher "knowingly conduct[ed] a 'string' test" he knew was inaccurate and thereby "fabricated a result that the angle and trajectory of the bullet established that the bullet that killed the victim came from [Plaintiff's] rifle." (Doc. 131 at 15 ¶ 65.)  Plaintiff further claims that Mascher "fabricated the string test results; he knew the results were inaccurate because he performed the test outside and conducted it in a reckless manner with a faulty rod." (*Id.* ¶ 68.)

In their Motion, Defendants argue that in 1994, no clearly established law prohibited Defendant Mascher from using, or relying on, the trajectory string test.  (Doc. 138 at 13.) Defendants assert that *Youngblood* "would have instructed Mascher that the Constitution does not proscribe his reliance on one type of forensic test over another." (*Id.*)  Defendants also contend that by 1994, the Ninth Circuit recognized that "the police had no constitutional duty to perform . . . more sophisticated tests." (*Id.*) (quoting *United States v. Westerdahl*, 945 F.2d 1083, 1087 (9th Cir. 1991)).

In his Response, Plaintiff argues that Defendant Mascher "fabricated evidence by conducting a string test outdoors, knowing it would produce flawed results that implicated [Plaintiff] because the test was inherently inaccurate when conducted outside." (Doc. 153 at 14.)  Thus, Plaintiff contends, "Mascher knew or was recklessly indifferent to the fact that for these reasons and others, the string test would produce unreliable results." (*Id.*) Plaintiff further asserts that the string trajectory test formed a basis for his June 30, 1994 indictment and allowed investigators to place Plaintiff in a standing position at the time of the shooting to concoct a theory that Plaintiff fired three rounds at the Jeep. (*Id.* at 16.) Thus, according to Plaintiff, the string test "may therefore have provided a purported basis for the officers' failure to collect other exculpatory evidence and/or to allow that evidence to be destroyed." (*Id.*)

Plaintiff has not alleged facts to support a fabrication-of-evidence claim against Defendant Mascher based on the string trajectory test.  Plaintiff alleges that Mascher

knowingly performed the test in conditions that would produce flawed results. (*Id.*) However, the performance of a test under dissimilar conditions does not amount to a fabrication of evidence. Moreover, Plaintiff concedes that Mascher testified at Plaintiff's trial that the string test was flawed and that a subsequent laser test was necessary; Plaintiff does not allege that Mascher lied during his testimony about how he performed the string trajectory test or the results of those tests, and, in any event, Plaintiff had an opportunity to cross-examine Mascher about the test and did so successfully. Thus, Plaintiff has not shown that he suffered any injury because of the string trajectory test.

### 2. Failure to Collect/Preserve Potentially Exculpatory Evidence

Plaintiff alleges Defendant Mascher intentionally or recklessly failed to preserve the Jeep's rocker panel and determine if there were bullet fragments inside it; deliberately failed to investigate who was driving the second vehicle and whether he had a gun; destroyed exculpatory evidence by altering the crime scene and condition of Plaintiff's gun; intentionally refused or recklessly failed to report the location Detective Martin found the bullet casing or ensure Martin reported the location; and "deliberately and recklessly" failed to search for casings in the Jeep and roadway. (Doc. 131 at 8-13 ¶¶ 35-53.)

First, the Court has found no pre-1994 case in which the Supreme Court or the Ninth Circuit found that failure to perform a particular test amounted to a due process violation. As discussed above, due process does not compel the police to conduct any particular forensic tests. Moreover, Plaintiff has not alleged facts sufficient to support a conclusion that such tests, if they had been performed, would have been likely to produce exculpatory evidence. Plaintiff does not even allege what tests could have been performed, let alone allege facts to support a conclusion that those tests would have produced results that tended to exculpate Plaintiff.

Plaintiff also alleges in the SAC that Defendant Mascher "intentionally or recklessly failed to preserve the rocker panel and determine if there were bullet fragments inside it because he knew or was recklessly indifferent to the fact that such evidence would or could

be exculpatory to [Plaintiff]. This resulted in the inevitable destruction of evidence that would have exonerated [Plaintiff]" because Plaintiff only discharged one bullet, which was believed to have killed Thurman.  (*Id.* ¶ 37.)  Even if there were bullet fragments in the rocker panel, that does not "exonerate" Plaintiff; the bullet he admits was discharged from his rifle still could have been the bullet that killed Thurman.  The mere existence of bullet fragments in no way exculpates Plaintiff.

As discussed above, to meet the standard of constitutional materiality for purposes of a claim for failure to collect or preserve evidence, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Trombetta*, 467 U.S. at 489.  Plaintiff has not alleged facts to support that the rocker panel possessed an exculpatory value that was apparent *at the time*.

### 3. Reckless Investigation

Defendants argue that there is no constitutional claim for reckless investigation, and the closest the Ninth Circuit has ever come to recognizing a separate claim for constitutional "reckless investigation'" was in *Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009), a case that was decided 15 years *after* the investigation in this case occurred.  The Court agrees with Defendants.  In 1994, neither the Supreme Court nor the Ninth Circuit had recognized a due process claim based on a reckless criminal investigation.

Plaintiff attempts to rely on *Tennison* for the proposition that "[t]he Ninth Circuit has also recognized that recklessness (even without malicious intent) in investigating a criminal case can be a constitutional violation." (Doc. 153 at 12.)  However, *Tennison* did not stand for the principle that recklessly investigating a crime amounts to a due process violation.  The plaintiffs in *Tennison* alleged that inspectors *withheld* material, exculpatory evidence in violation of *Brady*. *Id.* at 1086.  The Ninth Circuit held that "a § 1983 plaintiff

must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Id.* at 1088. Here, Plaintiff does not allege that Mascher withheld material, exculpatory evidence from prosecutors. In any event, as noted above, *Tennison* was decided 15 years too late to be of any use to Plaintiff.

Plaintiff also relies on *Wilson v. Lawrence County, Mo.*, 260 F.3d 946 (8th Cir. 2001), in which the Eighth Circuit recognized a due process claim for reckless investigation, but that case was decided seven years after the investigation at issue here, and, in any event, is not binding on this Court. The Eighth Circuit in *Wilson*, citing *Brady*, observed that law enforcement officers "have a responsibility to criminal defendants to conduct their investigations and prosecutions fairly" and identified the liberty interest at stake as the "interest in obtaining fair criminal proceedings." *Id.* at 956-57. However, this broad statement of law does not constitute clearly established precedent that a reckless investigation could violate the Due Process Clause. And the facts in *Wilson* are not analogous to the facts in this case.

In *Wilson*, the plaintiff asserted a claim that officers conducting a post-arrest investigation had chosen not to pursue certain leads that pointed away from the plaintiff's guilt for a homicide. *Id.* at 957. The plaintiff pointed to information concerning an escaped felon with a *modus operandi* matching the homicide and an eyewitness who saw someone outside of the house shortly before the fire (and who would have testified that the person she saw was not the plaintiff) as the leads the officers chose not to pursue. *Id.* at 955. Importantly, the Eighth Circuit did not conclude the plaintiff had stated a due process claim based on these facts; rather, the court concluded only that the proper standard to judge whether the officers' conduct violated due process was recklessness. *Id.* at 957.

As discussed above, "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847. The Supreme

Court in *Collins* stated that its cases "dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense." 503 U.S. at 129. In *Lewis*, the Supreme Court "made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." 523 U.S. at 848. Thus, only "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849.

Since *Collins*, neither the Supreme Court nor the Ninth Circuit has applied the "conscience-shocking" test to a reckless investigation claim. In *Albright v. Oliver*, the Supreme Court observed that "the protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity," and the petitioner's claim "to be free from prosecution except on the basis of probable cause [was] markedly different from those recognized in this group of cases." 510 U.S. 266, 272 (1994). *Id.* The Court concluded that substantive due process could not afford the petitioner relief for his claim that he was prosecuted without probable cause. *Id.* at 275. Likewise, in *Baker v. McCollan*, 443 U.S. 137 (1979), the Supreme Court found no cognizable constitutional claim where the defendant's actions in detaining the plaintiff for three days, despite his protestations of innocence and without investigating those protests, amounted to no more than negligence. *Id.* at 144.

Plaintiff's allegations do not support a conclusion that Defendant Mascher's investigation "rose to the conscience-shocking level." *Lewis*, 523 U.S. at 849. Thus, the Court finds that Plaintiff fails to state a claim against Defendant Mascher in the Second Amended Complaint.

### D. Dannison

#### 1. Fabrication of Evidence

In his Response to Defendants' Motion to Dismiss, Plaintiff asserts that Defendant Dannison "fabricated evidence" by "drafting false forensic reports with unsupported,

inaccurate findings that the Jeep could backfire and make a noise like a gunshot." (Doc. 153 at 18.)  However, Plaintiff's allegations regarding Dannison's testing of the Jeep do not support a conclusion that Dannison "fabricated" evidence.  Regardless of Dannison's purpose for conducting the testing, Plaintiff has not alleged that the *results* of the tests were fabricated; rather, Plaintiff's claim is that Dannison purposely tested the Jeep in conditions that he knew did not match the conditions on the night Thurman was killed.

As Defendants point out in their Reply to Plaintiff's Response, Plaintiff does not allege in the Second Amended Complaint that Defendant Dannison manipulated any part of the Jeep.  (Doc. 157 at 10.)  The only mention of the ignition in the SAC is that in connection with his post-conviction-relief efforts, Plaintiff obtained opinions from multiple third-party mechanics who indicated that rapid, consecutive, fire-emitting backfires would have required perfect and precise conditions that are not easily replicated, such as problems with the ignition system, voltage leaks, and quickly switching the ignition on and off and on again.  (Doc. 131 at 39 ¶ 178.)

Plaintiff alleges in the SAC that because Defendant Dannison knew Detective Martin had interviewed an individual at the scene who claimed to be a mechanic and that this individual had told Martin it was "impossible" for a Jeep to backfire in those conditions, Dannison's attempts to produce contrary test results amounted to "fabricating" evidence in an effort to "frame" Plaintiff.  (*Id.* at 38 ¶ 175.)  The Court rejects Plaintiff's suggestion that a police officer can be held liable for a due process violation because the officer attempted to achieve test results that contradicted the opinion of a witness interviewed by a different officer.

The Court finds that Plaintiff's allegations do not support a conclusion that Defendant Dannison "fabricated" evidence by testing the Jeep.

### 2. Destruction of Exculpatory Evidence

Plaintiff's claim that Defendant Dannison left shell casings in an unsecured lot is not fairly characterized as a claim for deliberate destruction of exculpatory evidence.

Rather, Plaintiff's complaint is that Defendant Dannison failed to *preserve* the shell casings.  As discussed above, in *Youngblood*, the Supreme Court reasoned that "failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," does not violate the Due Process Clause. 488 U.S. at 57.  "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the *exculpatory* value of the evidence at the time it was lost or destroyed." *Id.* at 56 n.*.

Plaintiff's allegations suggest, at most, that Defendant Dannison negligently failed to preserve evidence by leaving it in an unsecured impound lot.  However, negligence does not amount to bad faith.  Plaintiff has not alleged that Dannison *knew* that the shell casings had *exculpatory* value at the time he left the casings in the Jeep.  Plaintiff alleges only that Dannison knew of the "existence" of casings.  (Doc. 131 at 31 ¶ 146.)  Plaintiff claims the casings, if collected, "would have proven [Plaintiff's] evidence by showing the teenagers in the Jeep had a gun that fired .22 calibers and possibly fired the bullet that killed Thurman."  (*Id.* ¶ 147.)  Even if the passengers in the Jeep had a .22 caliber weapon, that does not negate the fact that Plaintiff's rifle shot a .22 caliber bullet; the existence of other casings does not tend to show that Plaintiff's bullet was not the bullet that struck and killed Thurman.  Thus, even if the shell casings ultimately would have proved useful to Plaintiff, Defendant Dannison's failure to preserve the evidence did not violate Plaintiff's due process rights.

### E.    Price

#### 1.    Destruction of Exculpatory Evidence

Plaintiff alleges that Defendant Price "deliberately and recklessly destroyed exculpatory evidence by failing to search for casings in the Jeep and roadway that would have established someone other than [Plaintiff] fired the weapon that killed" Charles Thurman.  (Doc. 131 at 12 ¶ 53.)  Thus, Plaintiff alleges that by failing to search for

evidence, Defendant Price deliberately and recklessly *destroyed* potentially exculpatory evidence. This characterization of Defendant Price's conduct is disingenuous; his alleged conduct is more accurately portrayed as a claim for failure to *collect* potentially exculpatory evidence. *See United States v. Martinez-Martinez*, 369 F.3d 1076, 1087 (9th Cir. 2004) (recognizing that failure to collect potentially useful evidence is "distinctly different" from "destruction of evidence that is already extant").

As noted above, in *Trombetta*, the Supreme Court held that the government may have a duty to preserve evidence after the evidence is gathered and in possession of the police, but the Court did not impose a duty to obtain evidence. 467 U.S. at 488-90. In *Miller v. Vasquez*, 868 F.2d 1116 (9th Cir. 1989), the Ninth Circuit applied the principles set forth in *Youngblood* and held that "a bad faith failure to collect potentially exculpatory evidence would violate the due process clause." *Id.* at 1120. The Ninth Circuit reasoned that "[s]ince, in the absence of bad faith, the police's failure to *preserve* evidence that is only potentially exculpatory does not violate due process, then a fortiori neither does the good faith failure to *collect* such evidence violate due process." *Id.*

Even construing Plaintiff's claim against Defendant Price as a claim for failure to *preserve* evidence, Plaintiff fails to state a claim. In *Youngblood*, the Supreme Court noted that failure to preserve even potentially exculpatory evidence does not automatically constitute a due process violation. 488 U.S. at 58. It is only when the "defendant can show bad faith on the part of the police[ ] [that] failure to preserve potentially useful evidence" amounts to the denial of due process. *Id.* In *Miller*, the Ninth Circuit found there was a colorable habeas corpus claim that an officer had failed to collect potentially exculpatory evidence in bad faith where the officer referred to the defendant "by using an extremely derogative expletive"; interviewed the victim less than 24 hours of an attack, learned of the existence of a blood-stained jacket belonging to the victim, and failed to collect it; the officer later testified he had "forgotten" the jacket; and the officer "tried to dissuade

witnesses from testifying by informing them of [the defendant's] prior criminal history and indicating that their testimony would not exonerate [the defendant]."  868 F.2d at 1121.

Here, Plaintiff has not alleged facts to support a conclusion that Defendant Price knew that additional casings in the Jeep and roadway existed, that this evidence was potentially exculpatory, and that Price nevertheless failed to search for it.  Rather, Plaintiff alleges only that the failure to use the metal detector on the roadway and Jeep "was either intentional or extremely reckless to avoid finding proof the teenagers had a weapon, which would have proved [Plaintiff's] innocence." (Doc. 131 at 13 ¶ 53.)  The *potential* existence of evidence cannot support a claim for bad faith failure to potentially exculpatory evidence. Price could not have been aware of the potentially exculpatory value of evidence that *might* have existed.  Thus, Plaintiff has not adequately alleged that Defendant Price failed, in bad faith, to collect or preserve potentially exculpatory evidence.

Plaintiff also alleges that Defendant Price conducted a reckless investigation.  As discussed above, in 1994, there was no clearly established law recognizing a due process claim based on reckless investigation.  *See Trombetta*, 467 U.S. at 488 (bad faith requires more than mere negligence or recklessness; it requires "official animus" or a "conscious effort to suppress exculpatory evidence").

Plaintiff contends Defendant Price is not entitled to qualified immunity if he conducted a reckless investigation "with bias." (Doc. 153 at 20.)  He cites no authority for this proposition.  Instead, Plaintiff argues that before 1994, "Ninth Circuit precedent required police officers to conduct their investigations neutrally and thoroughly." (*Id.* at 11.)  Plaintiff cites *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283 (9th Cir. 1999), for this proposition, but that case does not stand for the proposition that a defendant is not entitled to qualified immunity if he conducts a reckless investigation with bias.  The issue there was whether local police officers were entitled to qualified immunity as to a claim that the officers had knowingly or recklessly included false information in search warrant affidavits because they had reasonably relied on information provided by

1  FBI agents.  *Id.* at 1289-90.  Although Plaintiff asserts the Ninth Circuit in *Mendocino*
2  *Environmental Center* held that police officers have a "duty to reasonably inquire or
3  investigate . . . reported facts," and are not entitled to qualified immunity when relying "on
4  information obtained from other law enforcement officials" in violation of duty to
5  investigate further, that is not an accurate characterization.  The Ninth Circuit only
6  observed, in a footnote, that "[a]lthough a police officer is entitled to rely on information
7  obtained from fellow law enforcement officers, this in no way negates a police officer's
8  duty to reasonably inquire or investigate these reported facts.  We have denied qualified
9  immunity to police officers who had indisputably relied on information obtained from other
10 law enforcement officials, when we concluded that they violated their duty to conduct
11 further investigation."[13]  *Id.* at 1293 n.16.

12      Plaintiff also cites *Brady* and *Agurs* as pre-1994 sources of the proposition that a
13 constitutional violation occurs when officials do not "conduct their investigations and
14 prosecutions fairly." (Doc. 153 at 12.)  However, *Brady* does not apply to Plaintiff's claim
15 against Defendant Price because Plaintiff has not alleged that material, exculpatory
16 evidence was *withheld* by the State.  *See* 373 U.S. at 87 (holding that "the suppression by
17 the prosecution of evidence favorable to an accused upon request violates due process
18 where the evidence is material either to guilt or to punishment, irrespective of the good
19 faith or bad faith of the prosecution").  Likewise, the Supreme Court in *Agurs* considered
20 whether a prosecutor "has any constitutional duty to volunteer exculpatory matter to the
21 defense, and if so, what standard of materiality gives rise to that duty." 427 U.S. at 107.

22

23      [13] *Mendocino Environmental Center* also was decided five years after the
   investigation in this case, and the cases the Ninth Circuit cited do not assist Plaintiff.  *See*
24 *Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir. 1986) (federal agents' reliance on
   assurances by local police officers that appropriate warrants had been obtained, and
25 resultant failure to inquire about the nature or scope of these warrants, was unreasonable);
   *United States v. Kyllo*, 37 F.3d 526, 529 (9th Cir. 1994) (inclusion in affidavit of account
26 of arrest provided by another police officer and failure to conduct additional investigation
   may be reckless when account omitted material facts).  Neither *Guerra* nor *Kyllo* stands
27 for the proposition that conducting a reckless investigation with bias violates a criminal
   defendant's due process rights.

28

*Agurs* has no relevance to Plaintiff's claim that Defendant Price conducted a reckless investigation.

Furthermore, Plaintiff has not alleged facts to support a conclusion that Defendant Price conducted his investigation with bias. Plaintiff does not identify a particular bias Defendant Price had against him, let alone allege facts to support a conclusion that Price recklessly conducted his investigation *because of* any such bias.

For the foregoing reasons, the Court finds that Plaintiff fails to state a claim against Defendant Price.

### F.   Williamson

#### 1.   Fabrication of Evidence

Plaintiff alleges that Defendant Williamson fabricated evidence with respect to the string trajectory test. For the reasons discussed above with respect to Defendant Mascher, the Court finds Plaintiff fails to state a fabrication-of-evidence claim against Defendant Williamson based on the string trajectory test.

#### 2.   Failure to Preserve/Collect Exculpatory Evidence

Defendant Williamson testified at trial that shortly after the incident, in June 1994, he observed several .22 caliber casings and at least one unspent .22 bullet in the rear seat area of the Jeep. Defendant Williamson also testified that he saw beer cans, multiple cartridges, and possibly fired casings of a small caliber in the back of the Jeep. Defendant Williamson testified that the casings he found were .22 Remington manufactured bullets, not the "Super X Winchester .22" casings that Plaintiff owned and provided to Defendants. (*Id.* ¶ 133.) Defendant Williamson did not prepare a report that stated that he had found empty beer cans and different model .22 bullet casings in the Jeep. (*Id.* at 29 ¶ 136.)

Defendants argue that in the SAC, Plaintiff identifies Mike Winney as the public employee with the responsibility to collect and photograph evidence, and that the casings and bullet were not destroyed but, rather, lost in a theft at the impound yard. (Doc. 138 at 15.) Defendants contend that even without a report from Defendant Williamson, "Plaintiff

knew enough about his observations to obtain admissions during the trial from Williamson." (*Id.*) Defendants further assert that despite the theft, Defendant Williamson found and collected an unspent .22 cartridge from the Jeep, which Plaintiff does not allege was tested in any manner, much less a manner yielding exculpatory results. (*Id.*) Thus, Defendants argue, Plaintiff does not allege a "destruction of evidence," but an argument that someone "ought to have" collected the evidence. (*Id.*)

In his Response, Plaintiff contends that "turning a blind [sic] to obvious material exculpatory evidence, then allowing it to be lost or stolen from an open-top Jeep in an unsecure impound, is a failure to preserve (if not the destruction of) evidence." (*Id.* at 17.) Plaintiff argues that "photographing or collecting this key evidence would have indeed impacted [Plaintiff's] ability to prove his innocence" because evidence of ammunition from a different bullet manufacturer established the existence of a separate weapon and separately fired shots, as evidenced by the spent shell casings. (*Id.*)

The Ninth Circuit in *Miller* held that a bad faith failure to collect potentially exculpatory evidence would violate the due process clause. Thus, Plaintiff must allege facts to support a conclusion that the evidence that was not collected was potentially exculpatory and that the potentially exculpatory value was apparent at the time the evidence was not collected.

Plaintiff asserts that the unspent bullet and shell casings were potentially exculpatory because evidence of ammunition from a different bullet manufacturer established the existence of a separate weapon and separately fired shots, as evidenced by the spent shell casings. (Doc. 153 at 17.) Plaintiff obliquely alleges that Defendants knew bullets "involved in the incident" were produced by a different manufacturer than the bullets Plaintiff gave to police. (*Id.* at 7.) However, Plaintiff does not allege what type of bullet killed Charles Thurman. If the bullet that killed Thurman was also manufactured by Winchester, the fact that other .22 casings were found in the Jeep would not tend to

exculpate Plaintiff.[14]  *See Youngblood*, 488 U.S. at 56 n.* (noting that the plaintiff, who had been convicted of sexual assault of child, had not shown that the police "knew the semen samples [from the victim's body and clothing] would have exculpated him when they failed to perform certain tests or to refrigerate the boy's clothing; this evidence was simply an avenue of investigation that might have led in any number of directions").

Although Defendant Williamson testified at Plaintiff's trial that he had observed several .22 caliber casings and at least one unspent .22 bullet in the rear seat area of the Jeep and that the Jeep's contents should have been photographed before it was seized in the routine course of such an investigation, Williamson's recognition that evidence could have been *relevant* does not amount to recognition that the evidence was potentially exculpatory.  Thus, Plaintiff has not alleged facts to support a conclusion that the potentially exculpatory value of the shell casings was apparent at the time Defendant Williamson observed them in the Jeep.

In addition, as discussed above, Plaintiff cross-examined Defendant Williamson about the shell casings, unspent bullet, and beer cans, and Williamson described what he had seen.  Plaintiff therefore had an opportunity to argue at his trial, for example, that the investigation was flawed and that the shell casings and bullet that were not collected pointed to his innocence.  Plaintiff does not identify any testing that could have been conducted on the evidence or how the results of any such testing would tended to have exculpate him.  Thus, Plaintiff has not alleged facts to support a conclusion that the evidence was "of such a nature that [he] would be unable to obtain comparable evidence by other reasonably available means."  *See Trombetta*, 467 U.S. at 489.

---

[14] Plaintiff sought post-conviction relief based on former Defendant Ernest Peele's testimony that, based on comparative bullet lead analysis, the bullet that killed Thurman, as well as a lead fragment found in the Jeep's tire, was "analytically indistinguishable" from .22 caliber ammunition found in Plaintiff's possession.  Peele testified that the test results were "typical of … what we expect when we analyze bullets from the same box of cartridges.  *State v. Krause*, No. 2 CA-CR 2015-0326-PR, 2015 WL 7301820, at *1 (Ariz. Ct. App. Nov. 19, 2015).

Plaintiff also alleges that Defendant Williamson "destroyed potentially exculpatory evidence in bad faith, since it is practice and custom to collect ballistic evidence and evidence of potential intoxication of occupants of a car involved in a shooting at a crime scene, and any reasonable investigator would do so."  (Doc. 131 at 28 ¶ 132.)  These allegations do not permit a reasonable inference that Williamson failed in bad faith to collect the evidence.  Although the Ninth Circuit in *Heffington* stated that a police department's compliance with "departmental procedure" should be regarded as an indication that the disposal of evidence was not performed in "bad faith," it does not follow that failure to comply with "departmental procedure" indicates a failure to collect evidence was in bad faith.  952 F.2d at 281.  Mere failure to comply with "departmental procedure" suggests failure to collect the evidence was negligent as much as it suggests that the failure was in bad faith.  Like the police in *Youngblood*, Defendant Williamson's failure to collect or preserve the evidence "can at worst be described as negligent."  *Id.* at 58; *see also Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (failure to follow departmental regulations does not establish a constitutional violation).

Finally, to the extent that Plaintiff's claim against Defendant Williamson is based on Williamson's failure to write a report stating that he had observed but had not collected empty beer cans and different model .22 bullet casings in the Jeep, as Defendants note, Plaintiff knew about the empty beer cans and bullet casings despite Williamson not having noted them in a report.  As noted above, Plaintiff questioned Defendant Williamson at trial about the beer cans and bullet casings.  Thus, the existence of the beer cans and bullet casings was not concealed from Plaintiff.  *See id.* at 58.

The Court finds that Plaintiff fails to state a claim against Defendant Williamson in the Second Amended Complaint.

## G.   Yavapai County

The Court has concluded that Plaintiff has not stated a claim against any of the individual Defendants.   Plaintiff's claim against Yavapai County under *Monell v.*

*Department of Soc. Servs. of New York*, 436 U.S. 658 (1978), necessarily fails because he has not alleged facts sufficient to support a conclusion that he suffered any injury. *See id.* at 694 (holding that "a local government may not be sued under § 1983 for *an injury* inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the *injury* that the government as an entity is responsible under § 1983") (emphasis added).

### H.   Conclusion

The Court concludes that Plaintiff fails to state a claim upon which relief can be granted against Defendants Yavapai County, Mascher, Dannison, Price, and Williamson. The Court will therefore grant these Defendants' Motion to Dismiss.

## V.   Defendant Hueske's Motion to Dismiss

### A.   Allegations Specific to Defendant Hueske

Defendant Hueske analyzed the speed at which consecutive shots could be fired from Plaintiff's rifle and the velocity of bullets emitted from the rifle. (Doc. 131 at 19 ¶ 85.) Hueske also conducted an accident reconstruction that analyzed how the three presumed bullets could have been shot by a single shooter. (*Id.* ¶ 86.) In conducting the test, Hueske relied on Defendant Price's estimate of the speed at which the Jeep was traveling and assumed the speed test results were accurate. (*Id.* ¶¶ 87-88.)

As Plaintiff's trial, Hueske testified to the following conclusions based on his tests: all three bullets could have been shot from one shooter; the presumed bullet holes in the rocker panel and the tire well were shot by the same gun held in the same position; the bullet that hit Thurman could also have been shot by the same gun, but the gun would have had to have been repositioned due to the difference in height and its position directly above the rocker panel; that the shooter could have been "tracking" Thurman, which Hueske defined as "following the target with the sights of the weapon"; and the shooter would have had to have been positioned lying on the ground. (*Id.* at 20 ¶¶ 89-93.)

Defendant Hueske testified that he did not test whether the rifle would fire a shot when hit against the ground because he "wasn't asked" to do so and because he "saw no reason to do it as well, given the information that [he] was supplied." (*Id.* ¶ 94.) Hueske testified that he did not test how much force was needed, or distance required, to pull the trigger of the rifle and make it fire and that he did not test whether Plaintiff had sufficient time to fire three shots at Thurman's Jeep while changing the angle of the rifle between shots to reflect the different bullet entries found in the Jeep, which Plaintiff admitted struck at different heights. (*Id.* ¶¶ 95-96.) Hueske further testified that the variance in height of the three bullets that struck the Jeep was caused by a shooter changing the angle of the gun barrel or gun butt. (*Id.* at 22 ¶ 97.)

Plaintiff alleges, "[u]pon information and belief, Defendant Hueske intentionally omitted material facts in performing the laser test and analysis to fabricate reports implicating [Plaintiff]. Hueske knew that if he incorporated the facts above in his analysis, available to them at the time of testing, it was extremely likely, if not a certain[ty], his test results would have established Plaintiff's innocence—that he could not have fired the 3 shots in the time that the Jeep passed [Plaintiff] on the road." (*Id.* at 22 ¶ 99.) Plaintiff also claims that "Defendant Hueske further intentionally omitted material facts in testing the speed at which [Plaintiff's] rifle could fire and whether it was possible [Plaintiff] fired three shots of various heights at the Jeep to fabricate a report that would frame [Plaintiff] and avoid finding exculpatory evidence." (*Id.* ¶ 100.) Plaintiff contends that "[b]ased on the numerosity and materiality of Hueske's omissions . . . it is reasonable to conclude he acted intentionally, not negligently, in refusing to incorporate available, material and exculpatory facts in his test methods since he knew doing so would produce evidence establishing [Plaintiff's] innocence." (*Id.* at 23 ¶ 102.)

## B.    Defendant Hueske's Arguments

In his Motion to Dismiss, Defendant Hueske argues that Plaintiff has not stated a claim against him and in any event, Hueske is entitled to qualified immunity with respect

to his analysis and trial testimony.  (Doc. 137 at 9, 12.)  Defendant Hueske contends that Plaintiff does not assert that Hueske lost or destroyed evidence; "rather, Plaintiff complains that Hueske did not conduct or perform certain additional tests and, without any factual basis, Plaintiff creatively asserts that tests were intentionally or recklessly not completed because of some alleged conspiracy to convict Plaintiff."  (*Id.*)  Defendant Hueske asserts that Plaintiff's allegations "are not supported by clearly established law at the time of the events" described in the Second Amended Complaint, and if anything, "clearly established law *demonstrates* that Hueske's conduct was permitted by law."  (*Id.* at 10.)  Defendant Hueske contends that "[a]dding an unsupported allegation that an action was done intentionally does not make it a viable claim."  (*Id.* at 13.)

### C.    Plaintiff's Response

In his Response, Plaintiff argues that Defendant Hueske violated his constitutional rights because Hueske deliberately ignored material evidence that was likely to exculpate Plaintiff; recklessly or intentionally refused to investigate material facts; and failed to test or otherwise determine whether Plaintiff could have possibly fired all three shots that struck the Jeep and Thurman.  (Doc. 147 at 11-12.)  Plaintiff contends Defendant Hueske is not entitled to qualified immunity because each of Hueske's alleged constitutional violations was clearly established before Hueske's 1994 investigation and the violations are "sufficiently fundamental to be rooted in common sense, and need not be established by specific precedent."  (*Id.* at 7.)

With respect to the claim that Defendant Hueske fabricated evidence, Plaintiff contends that the Ninth Circuit in *Devereaux* "did not create a constitutional right" but instead "relied on the long-established, common-sense right to be free from prosecution based on knowingly false evidence."  (*Id.* at 8.)  Plaintiff further argues that before 1994, the Ninth Circuit required police officers to conduct their investigation neutrally and thoroughly.  (*Id.* at 9.)  With respect to the conspiracy claim, Plaintiff asserts that it has been well established since at least 1989 that officers are not entitled to qualified immunity

when conspiring to violate a person's constitutional rights. (*Id.* at 10.) Plaintiff further argues that even if Defendant Hueske's individual conduct did not rise to the level of violating his constitutional rights, "case law also supports liability for an officer's 'integral participation' in an alleged violation, or joinder in a conspiracy to violate constitutional rights." (*Id.*)

### D.    Analysis

#### 1.    Fabricated Evidence

Plaintiff's first basis for Defendant Hueske's liability is that Hueske "fabricated" evidence. However, in the Second Amended Complaint, Plaintiff alleges that Defendant Hueske *failed* to conduct certain tests and relied on inaccurate data. Plaintiff does not allege that Defendant Hueske presented false testimony or evidence or acted in bad faith in conducting the test to determine the trajectory of the bullet that hit the Jeep's rocker level. Plaintiff's assertion that failure to conduct tests and reliance on inaccurate data amounts to *deliberate* fabrication of evidence is specious. Plaintiff has not alleged facts to support a conclusion that Defendant Hueske fabricated evidence.

#### 2.    Reckless Investigation

For the reasons discussed above, the Court concludes Plaintiff fails to state a reckless investigation claim against Defendant Hueske.

#### 3.    Conspiracy

Plaintiff's third basis for Defendant Hueske's liability is that Hueske engaged in a conspiracy with Defendants to secure Plaintiff's conviction. To state a § 1983 conspiracy claim, Plaintiff must allege: (1) the existence of an express or implied agreement among the defendant officers to deprive him of his constitutional rights and (2) an actual deprivation of those rights resulting from that agreement. *Ting v. United States*, 927 F.2d 1505, 1512 (9th Cir. 1991). "To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate the existence of an agreement or 'meeting of the minds' to violate constitutional rights." *Mendocino Envtl. Ctr.*, 192 F.3d

at 1301-02.  That is, Plaintiff must allege "which defendants conspired, how they conspired and how the conspiracy led to a deprivation of [the plaintiff's] constitutional rights." *Harris v. Roderick*, 126 F.3d 1189, 1196 (9th Cir. 1997).  Plaintiff must allege that Defendants have, "by some concerted action, intended to accomplish some unlawful objective for the purpose of harming another which results in damage.  Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Mendocino Envtl. Ctr.*, 192 F.3d at 1301.

Because conspiracy requires proof of subjective intent, it is subject to a heightened pleading standard. *Harris*, 126 F.3d at 1196.  The complaint must include "nonconclusory allegations containing evidence of unlawful intent." *Branch v. Tunnell*, 937 F.3d 1382, 1386 (9th Cir. 1991), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).   A complaint consisting of nothing more than "'naked assertion[s]' devoid of 'further factual enhancement'" must be dismissed under Rule 8. *Iqbal*, 556 U.S. at 678.

Here, Plaintiff fails to *specifically* allege how, when, or with whom Defendant Hueske conspired or how the conspiracy led to a deprivation of his rights.  Plaintiff's general allegation that Defendants "conspired and agreed to commit the above[-]described unconstitutional deprivations of [Plaintiff's] rights and acted in concert to deprive [Plaintiff] of his rights to be free from unreasonable seizures, to due process, to a fair trial, and to be free from groundless criminal prosecutions based on false evidence" is insufficient to state a conspiracy claim.  (Doc. 131 at 46 ¶ 211.)

Plaintiff argues in his Response to Defendant Hueske's Motion that Hueske "relied on" Defendant Price's speed test, "refusing to assess its accuracy, which significantly underestimated the speed Thurman's Jeep was travelling." (Doc. 147 at 14.)  Plaintiff claims this allowed Defendant Hueske to conclude Plaintiff had time to fire three bullets, two at the Jeep and one at Thurman.  (*Id.*)  These allegations do not support a conclusion that there was a "meeting of the minds" between Defendants Hueske and Price. *Mendocino*

*Envtl. Ctr.*, 192 F.3d at 1301-02.  Plaintiff does not allege that Defendants Hueske and Price ever discussed Plaintiff's case or their respective investigations.  Thus, Plaintiff fails to state a conspiracy claim against Defendant Hueske.

### 4.    Integral Participation/Joinder

Finally, Plaintiff contends that even if Defendant Hueske's individual conduct did not rise to the level of violating his constitutional rights, "case law also supports liability for an officer's 'integral participation' in an alleged violation, or joinder in a conspiracy to violate constitutional rights."  (Doc. 147 at 10.)  Plaintiff cites no pre-1994 precedent to support this assertion.  (*See id.*)

In *Johnson v. Duffy*, 588 F.2d 740 (9th Cir. 1978), the Ninth Circuit stated, "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  *Id.* at 743.  In addition, "[a]nyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable.  The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."  *Id.* at 743-44.

Here, Plaintiff does not allege facts sufficient to support a conclusion that Defendant Hueske knew or reasonably should have known that the testing he conducted or failed to conduct would cause *others* to inflict a constitutional injury on Plaintiff.  Furthermore, as recently as 2020, the Ninth Circuit has recognized that it has "yet to define the minimum level of involvement for liability under the integral-participant doctrine."  *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020).  The Ninth Circuit also has not clarified whether both legal (or proximate) cause and actual (or but-for) cause are required.  *Id.* at 942.  Thus, there necessarily was no clearly established law in 1994 that governed the requisite level of participation and causation for an integral participation claim.

1   For the foregoing reasons, the Court will grant Defendant Hueske's Motion to

2   Dismiss.

3   **VI.    Leave to Amend**

4   The Court has broad discretion to grant or deny leave to amend. *See Okwu v.*

5   *McKim*, 682 F.3d 841, 844 (9th Cir. 2012). "Normally, when a viable case may be pled, a

6   district court should freely grant leave to amend." *United States ex rel. Cafasso v. Gen.*

7   *Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (citing *Lipton v. Pathogenesis*

8   *Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002)). "However, 'liberality in granting leave to

9   amend is subject to several limitations.'" *Id.* (quoting *Ascon Props., Inc. v. Mobil Oil Co.*,

10   866 F.2d 1149, 1160 (9th Cir. 1989)). "Those limitations include undue prejudice to the

11   opposing party, bad faith by the movant, futility, and undue delay." *Id.* The Court's

12   discretion to deny leave to amend is particularly broad where a plaintiff has previously

13   amended the complaint. *Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355

14   (9th Cir. 1996).

15   Here, Plaintiff has made multiple attempts at stating a viable claim against

16   Defendants. This case has been pending for nearly two-and-a-half years and has not

17   advanced beyond the pleading stage. Defendants have litigated two Motions to Dismiss

18   and a Motion for Judgment on the Pleadings. The Court finds allowing Plaintiff to amend

19   his claims for a fourth time would unduly prejudice Defendants. In addition, Plaintiff has

20   not identified any amendment consistent with facts he has already alleged that would give

21   him a viable claim. *See Okwu*, 682 F.3d at 846. The Court finds allowing Plaintiff to

22   amend his claims would be futile. Thus, the Court will dismiss the Second Amended

23   Complaint without leave to amend.

24   **IT IS ORDERED:**

25   (1)    The reference to the Magistrate Judge is **withdrawn** as to Defendants'

26   Motions to Dismiss (Docs. 137, 138).

27   (2)    Defendant Hueske's Motion to Dismiss (Doc. 137) is **granted**. Defendants

28

Yavapai County, Mascher, Price, Williamson, and Dannison's Motion to Dismiss (Doc. 138) is **granted**.

(3)     The Second Amended Complaint (Doc. 131) is **dismissed without leave to amend**.

(4)     The Clerk of Court must close this case and enter Judgment accordingly.

Dated this 27th day of October, 2021.

Michael T. Liburdi
United States District Judge